No. 77,558

STATE OF KANSAS, *Appellee*, v. SAKONE MEL DONESAY, *Appellant.*
(959 P.2d 862)

Opinion filed May 29, 1998.

*Michael J. Helvey*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Sakone Mel Donesay appeals his jury convictions of premeditated murder, aggravated robbery, criminal damage to property, two counts of felony theft, and criminal possession of a firearm. Defendant, who was 14 at the time the offenses were committed, was tried as an adult. A controlling sentence of the hard 40 plus 100 months was imposed.

Donesay had been adjudicated as a juvenile offender in 1994 and had been held at the Youth Center at Atchison. Upon his conditional release, he returned to Dodge City to reside with his parents. On November 27, 1995, he and his father met with a community corrections officer in Dodge City and agreed to conditions of intensive supervision for Donesay. Under the agreement, Donesay was subject to a curfew and was not allowed to leave Ford County without a travel permit, there were to be no firearms in the residence and certainly not in defendant's possession, and violations of the law and consequent contact with law enforcement were grounds for revoking the conditional release.

On January 2, 1996, the community corrections officer received a telephone call from Donesay's father. He stated that Donesay had left home on December 31, 1995, had not returned, and was believed to be in Wichita.

The events leading to the charges against Donesay occurred during the first week of January 1996. Donesay and several compan-

ions went to Dodge City in a stolen car and stole another one there. Driving a Honda Accord stolen in Dodge City, Donesay returned to his parents' house, got a box which he put in the glove compartment, and drove back to Wichita. Donesay's father kept under his bed a .25 caliber handgun and magazine, which he had seen for the last time on January 1.

After Donesay damaged the front end of the Honda in a collision with a car driven by friends, they abandoned it in rural Sedgwick County. Before leaving the car, Donesay shot it with his father's gun.

Donesay and a friend then stole another Honda in Wichita. Even though they broke into the steering column to start the car without keys, when they found a set of keys in the glove compartment, they put them in the ignition so that the car would not look stolen. When they noticed that one of the headlights was out, they decided they needed to get another car to avoid being stopped by police.

In the early morning hours of January 8, they picked up three female friends and made another stop at the residence of an acquaintance.

Before locating another car to steal, Donesay and his companions saw a sheriff's patrol car traveling in the opposite direction. Officer Kevin Easter advised the dispatcher that he had observed a vehicle run a stop sign and that the driver appeared to be trying to lose him. Officer Easter made a U-turn and turned on his overhead lights. He advised the dispatcher that he was in pursuit and provided a description of the car as well as locations. In trying to get away from the officer, Donesay missed a turn, lost control, went through a fence, and drove into a residential yard.

When the car had come to a stop, Donesay reached under the seat to get the gun, jumped out of the car, and ran. Donesay later told police that he did not think Officer Easter saw that he had a gun and that Easter did not shoot at him or tell him to drop his gun. The officer chased Donesay and several times told him to stop. As Donesay was trying to vault over a fence, Easter grabbed his leg. Easter pulled Donesay off the fence and they both went down. Within a very short time, Easter put his fingers in Donesay's mouth. With Donesay on his right side and Easter on top of him,

Donesay put the gun over his shoulder and fired. Officer Bowker, who had arrived by then, heard two quick shots, a pause, and two more quick shots. Donesay testified that Easter "just faded away from me a little bit and I had to push him off a little bit." The defendant got up, saw Easter's gun, and grabbed it. As Donesay was getting up, he saw someone with a flashlight come around the corner and heard a gunshot. When Donesay tried to run, he fell. After a police officer caught and handcuffed him, they found that Donesay had a gunshot wound in his leg, which he had accidentally inflicted himself.

Officer Easter was shot at close range in the right forearm, right shoulder, back of the head, and the back of his neck. The bullet that entered the back of his neck traveled along his spinal column and through his right lung and liver, causing his death. Other injuries on his body included two small tears inside his lips, scrapes on his face, and a bite mark on his left leg.

The first issue we consider is whether it was error for the district court to admit Donesay's statements into evidence. While Donesay was in the hospital recovering from the gunshot wound in his leg, he gave several statements to police. Defense counsel filed a motion to suppress the statements, a hearing was conducted, and the district court denied the motion. Defense counsel objected when the State introduced the statements at trial.

There is no dispute that Donesay was handcuffed to the bed and in custody when he gave statements to the police in his hospital room. Detective Bruce Morton testified that at approximately 6 a.m. on January 8, 1996, he entered Donesay's hospital room. Three law enforcement officers were there guarding the room. Morton was accompanied by two other officers. Donesay was asleep, and there were IV needles in his arms. Officer Morton asked a nurse if it would be all right to interview Donesay, and she stated that the medicine he had been given would not impair his ability to understand what was going on. Donesay was awakened, and the police officers were introduced. Officer Morton started a portable cassette recorder, Donesay was advised of his *Miranda* rights, and he initialed the *Miranda* form.

After giving the *Miranda* warnings, Officer Morton asked, "[D]o you want to give us your side of the story?" Donesay said, "No, not right now." Then Donesay added that he did want to talk to the police, "but later." Morton continued, "Okay, you don't want to talk to us now though?" Donesay answered, "No, I'm too tired." Still, Morton persisted:

"Okay, you can't talk a little bit to us? Just to help, help kinda things out, let us know what happened? I mean, we're not gonna be here long. We're not gonna keep you up all day, we just kinda want to know what's going on so we can figure everything out. Uh, if you can stick with us for awhile, that would help us out a lot. Would you, would you be willing to do that? Huh?"

Donesay answered, "I don't know." Morton said, "Well, would you be willing to talk to me? You know, the sooner we talk about this, you know, the easier it's gonna be for everybody." Donesay replied, "Yeah, I guess I'll talk about it."

At Morton's urging to "tell me, basically what happened tonight," Donesay began talking. He said that he was driving around with friends when a police officer started following him. He was scared because the car was stolen. He sped up and tried to lose the officer. He went too fast, bumped into a fence, and started running. Officer Morton asked, "Okay, did, did the officer start chasing you?" This exchange followed:

"DONESAY: Yeah. I think he just jumped.
"MORTON: I'm sorry, I can't hear you.
"DONESAY: He just jumped on me.
"MORTON: He jumped on you?
"DONESAY: Yeah, he grabbed my leg.
"MORTON: He grabbed your leg?
"DONESAY: Yeah. (chuckle)
"MORTON: Then what happened?
"DONESAY: Then he started putting his finger in my mouth, just pulling my mouth.
"MORTON: Uh-huh.
"DONESAY: And he started, you know, he just, hitting, me.
"MORTON: Yeah.
"DONESAY: You know, like uh. So, I got mad and.
"MORTON: Okay, you got mad, then what?
"DONESAY: Oh,
"MORTON: (cough)

"DONESAY: [T]hat's, that's all I'll talk about it okay?
"MORTON: Huh?
"DONESAY: That's all I want to talk about."

Morton's next words were: "Okay, uh, can I ask you just one thing here?" The questions and answers continued:

"DONESAY: Huh?
"MORTON: Uh, you say you knew the car was stolen, okay? How'd you know the car was stolen?
"DONESAY: Cause. Because, man, I had my friend.
"MORTON: Yeah.
"DONESAY: I had my friend get it for me.
"MORTON: You had a friend get it for you?
"DONESAY: Yeah.
"MORTON: Okay. Would you be wanting to tell me your friend's name?
"DONESAY: No.
"MORTON: Okay, uh, is that the reason you started running from the officer, cause you knew the car was stolen?
"DONESAY: Yeah.
"MORTON: Okay. And when the officer chased you in the back and he grabbed your leg, that made you mad you said?
"DONESAY: No, when he hit me he made me mad.
"MORTON: When he hit you that made you mad? Okay, you don't, you, can you tell me what happened when you got mad?
"DONESAY: No, man, I don't want to talk about it."

Morton began, "So you don't want," and was interrupted by Grosland, one of the other officers: "Can you, can you answer us one, did the officer shoot you in the leg or uh, how'd that happen?" These questions and answers followed:

"DONESAY: Oh, I was . . . I don't know. I was just moving away and it, I seen another cop coming and he's just right there. I just got blasted, I didn't know how I got shot. Not til I fell on the floor and felt my leg.
"MORTON: Okay, you didn't know you got shot? Okay. Where, where did the officer hit you that made you mad?
"DONESAY: My face, he started pulling my mouth.
"MORTON: He started pulling your mouth and hitting you in the face?
"DONESAY: Yeah, pull, . . . sprayed mace all over me.
"MORTON: Okay, he was spraying mace on you at the time?
"DONESAY: Yeah.
"MORTON: Okay. And that's what it, it got you really upset?
"DONESAY: Yeah.

"MORTON: Okay, and you don't know how you got shot in the leg? You jus, [sic] you didn't feel it til, til [sic] when was the first time you discovered you got shot in the leg?

"DONESAY: I just fell.

"MORTON: When you fell?

"DONESAY: Yeah, cause I couldn't run.

"MORTON: Uh-huh.

"DONESAY: That's, that's about it.

"UNKNOWN: Was that by the car?

"MORTON: Was that when you was over by the car?

"DONESAY: Yeah.

"MORTON: Was you hollering for your friends to help you or anything?

"DONESAY: No, I just, wanted to say bye, just, you know.

"MORTON: Did you think you, something was happening to you or did you think you was in great peril or?

"DONESAY: Oh, I just, just knew I wasn't gonna see my friends again, so I told them, you know, hey, see you later, you know.

"MORTON: Why didn't you think you was gonna see your friends again?

"DONESAY: Try to look what I'm mixed up in, man.

"MORTON: What are you mixed up in that, that made you feel that way.

"DONESAY: That's all I want to talk about. I don't want to talk about it any more, man."

When Morton wrapped up the questioning, he gave the time as 6:20 a.m.

At the hearing on Donesay's motion to suppress the statements, Officer Morton testified that, in his view, during the questioning set out above, Donesay never invoked his constitutional right to remain silent. Instead, Morton proposed, Donesay simply was tired of talking and wanted to go back to sleep. On appeal, the State contends that Donesay was willing to talk, but not when he was tired. The State further contends that Donesay was willing to talk, but not about certain subjects, namely his shooting Officer Easter. In these circumstances, the argument continues, it was proper for the officers to inquire whether Donesay wanted to continue answering questions. The State relies on *State v. Fritschen*, 247 Kan. 592, 606-08, 802 P.2d 558 (1990). In that case, the issue was whether the defendant had asserted his right to remain silent. In *State v. Matson*, 260 Kan. 366, 374, 921 P.2d 790 (1996), the court stated that the rules applicable to a defendant's exercise of the right to counsel applied as well "where the right to remain silent is ex-

ercised." The court quoted the following passage from *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981):

" '[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " 260 Kan. at 373.

In *Fritschen*, Fritschen argued that he invoked his right to remain silent and that the police ignored him and took a statement. Here is the court's discussion of the issue:

"At the outset of the April 25 interview, Fritschen was advised of his *Miranda* rights, and he made a valid waiver of them. At one point during the interview, Fritschen made some indication that it hurt too much to talk about the murders. At the motion to suppress, Officer Byron Motter testified that Fritschen said, 'I don't want to talk about it any more, it hurts too much.' Fritschen argues that this was an assertion of his right to remain silent.

"Motter said that he interpreted this statement to mean that Fritschen was not invoking his right to silence, just that he did not want to think about the murder. Fritschen was upset at this point and was obviously having a hard time talking about the victims. At trial, Motter testified that the officers asked Fritschen if he could continue answering questions by nodding yes or no, and Fritschen agreed. His answers were reduced to writing and he signed the statement.

"At the pretrial suppression hearing, the court said, 'I am inclined to think . . . that the reason that he didn't want to talk was not the invocation of the *Miranda* right but merely because the situation and subject matter was so painful to him that he couldn't visualize it without extreme upset.'

"The issue here is whether Fritschen asserted the right to remain silent. In *Miranda*, the Supreme Court recognized that an assertion of *Miranda* rights may not always be clear. The Court said, 'If [defendant] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent.' 384 U.S. at 485.

"In *Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984), the Court recognized that a statement may be ambiguous as to whether a suspect is asserting his rights. The Court said that in determining whether the statement itself is ambiguous, only prior statements and the statement itself may be looked at. 469 U.S. at 100. Postrequest statements are not relevant.

"Because the *Smith* Court held that the statement therein at issue was an unambiguous request for counsel, the Court did not determine the procedure if a statement is ambiguous. The majority rule has been promulgated by the Fifth Circuit, which held that an interrogator may ask questions to clarify whether a suspect is asserting his rights. *Nash v. Estelle*, 597 F.2d 513, 517 (5th Cir.), *cert. denied* 444 U.S. 981 (1979). This approach seems compatible with *Miranda*.

"In *Crawford v. State*, 580 A.2d 571, 576-77 (Del. 1990), the defendant indicated prior to his arrest that he was seeking an attorney. After arrest, he was *Mirandized* three times and expressed a desire to talk with the police and did not request counsel. The Delaware court held that 'the police should be entitled to attempt to determine the suspect's intention . . . . If, however, the police make additional inquiries concerning a suspect's intentions, the clarifying questions may not coerce or intimidate the suspect or otherwise discourage his efforts to secure counsel.' The court emphasized that such attempts at clarification must be in good faith and held that, under the facts, the police acted in good faith.

"Here, Fritschen's statement does not even reach the level of a potentially ambiguous request to remain silent; Fritschen was saying he was upset and having difficulty talking. Here, even if the request was ambiguous, the officers followed the proper procedure by inquiring if Fritschen wanted to continue answering questions. Fritschen indicated he did. No error is shown." 247 Kan. at 606-08.

The assessment of whether defendant's words "reach the level" of a request to remain silent seems to have been made by the court as a matter of law. His words were treated as if they were plain and unambiguous and, therefore, not subject to construction. In *Matson*, too, the court seems to have decided as a matter of law whether the defendant had invoked his right to remain silent. The court simply stated: "Here, the defendant did not invoke his right to remain silent. He indicated that he would not answer questions about Ty Gerberding, but did not express a desire to terminate questioning altogether." 260 Kan. at 376.

Here, the district court made a factual finding that the defendant did not invoke his right to remain silent and denied the motion to suppress. The standard of review would be the following for an adult defendant:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence." *State v. Lewis*, 258 Kan. 24, Syl. ¶ 4, 899 P.2d 1027 (1995).

Where the accused is a juvenile 14 years of age or older, the court exercises "the 'greatest care' in assessing the validity of the confession." *State v. Robinson*, 261 Kan. 865, 888, 934 P.2d 38 (1997) (quoting *State v. Young*, 220 Kan. 541, 553, 552 P.2d 905 [1976]). In *Young*, the court concluded that an accused juvenile's pretrial waiver of his privilege against self-incrimination is controlled by *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), and *State v. Hinkle*, 206 Kan. 472, 479 P.2d 841 (1971). 220 Kan. at 546. In *Young*, this guiding principle was quoted from *In re Gault*:

" '. . . If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' (p. 55.)" 220 Kan. at 546.

In making its determination, the court considers the totality of the circumstances. 220 Kan. at 546. The factors considered in *Young* were:

- the age of the minor,
- the length of the questioning,
- the youth's education,
- the youth's prior experience with the police, and
- the youth's mental state.

Beyond the court's consideration of whether a constitutional right was invoked and irrespective of the decision, the substantial evidence standard, as adjusted for the juvenile defendant in the present case, would be applied in evaluating voluntariness of a confession. If we conclude as a matter of law that Donesay had not invoked his right to remain silent, application of the substantial evidence standard would be to the question of whether the accused knowingly and intelligently waived his constitutional right. If we concluded as a matter of law that Donesay had invoked his right to remain silent, the substantial evidence standard would be applied to the questions of whether the interrogation ceased for an appreciable period when the accused exercised a constitutional right and whether the statements made or the questions asked by police after exercise of the right amounted to questioning, its func-

tional equivalent, or were known to police to be likely to produce an incriminating response. See *Matson*, 260 Kan. at 375.

At the conclusion of the hearing on the motion to suppress, the trial judge made the following findings relative to Donesay's youthfulness: "Donesay's date of birth is January 28th, 1981, which would have made him 14, real close to being 15 years old at the time of . . . these interviews." Reviewing the *Miranda* form and the first "interview both together took around six minutes." Donesay was in the eighth grade and "certainly of average intellect." "[Donesay] has four prior adjudications. So he's had contact with the court system and police departments in the past." The interviews took place in Donesay's hospital room, "[h]e was medicated," but "the officers were all told that the medication would not affect Mr. Donesay's ability to understand, and that's reflected by his responses to the questions." With regard to Donesay's being away from his home and unaccompanied by a parent, the trial judge found:

"It's undisputed that Mr. Donesay's parents were not in Wichita. He may or may not have had a relative here in Wichita. But there was never a request on his part to converse with his parents before he talked with the officers.

. . . .

"[H]e was residing in Dodge City, Kansas. However, from the statements in the taped interview, he was no stranger to Wichita. He'd been to Wichita often enough to know that there were people here that didn't like him very much. So. Being in a strange city is not a factor in this case."

On the whole, the trial judge's observations on Donesay's juvenile status accurately reflect the record. Only two call for any comment, and those would not seem to be significant to resolution of this issue. The first is the length of the questioning. At the suppression hearing, Morton testified that it was 6:14 a.m. when Donesay signed the *Miranda* form, which was after the warnings had been reviewed and four pages into the transcript of the taped interview. At the end of the first interview, it was 6:20 a.m. The 6 minutes did not include review of the warnings. It may also be noted that Donesay's interaction with the police on the occasion of the first interview seems to have taken substantially longer than the tape recorded portion. The trial judge stated:

"[Defendant's] first conversation was with Agent Grosland at 3 o'clock in the morning, approximately. There's no interview. He came back, and I'll find it's more probably true than not true that Agent Grosland, Lieutenant Bardezbain, and Detective Morton returned to the hospital sometime around 5:35 in the morning.

"I find it's more probably true than not true that [the] reason the Miranda questions aren't asked until after 6 o'clock is that the KBI agent was getting history."

Second, whether defendant asked to have his parents present has not been shown to have either legal or factual relevance. Overall, though, the trial judge's view that the defendant was not particularly vulnerable to police overreaching due to his age is supported by substantial competent evidence.

With regard to the question of whether Donesay invoked his right to remain silent, the trial judge reviewed the transcript of the first interview:

"What troubles me about this case is the statements he doesn't wanna talk anymore. Initially, . . . it's just that he doesn't want to talk to him at that particular time because he's tired . . . .

"We get down to the bottom of page 5 of the transcript, . . . that's very clearly Mr. Donesay saying he doesn't wanna talk about the shooting.

"Page 6, . . . and Mr. Donesay again is willing to talk about something other than the shooting.

" . . . Mr. Donesay is more than willing to talk about getting shot himself. He's not willing to talk about having shot Deputy Easter."

Then the trial judge announced his decision:

"I don't find any of that to be ambiguous. When it's put in context, it's very clear what he's talking about.

"I find that Mr. Donesay understood all of his rights; that the fact that Detective Morton gave him a little bit more explanation on two of them does not indicate that Mr. Donesay didn't understand them. He understood what his rights were. He talked to the detective or—the detective—the Agent and Lieutenant freely, voluntarily, and understandably, did so as a product of his free—of his free and independent will.

"And I'll deny the motion.

"I'm relying on *Gideon* and . . . *Fritschen*, 247 Kansas 592."

It appears that the trial judge found that Donesay's statements about not wanting to talk, like Fritschen's, did not amount to requests to remain silent. The judge found that Donesay said he was

tired and that he did not want to talk about shooting Easter, but did not invoke his right to remain silent. There is a difference between the circumstances in *Fritschen* and those in the present case that was overlooked by the trial judge. Fritschen said *he* did not want *to talk* about his stabbing the victims because "it hurts too much," but he indicated his willingness to answer questions by nodding his head. 247 Kan. at 595-96, 606. Thus, the court found that "Fritschen was saying he was upset and having difficulty talking" rather than invoking his right to remain silent. 247 Kan. at 607. In the present case, in contrast, Donesay never indicated his willingness to answer questions nonverbally or to allow someone else to formulate the words for him.

Although *Fritschen* is distinguishable from the present case, it and *Matson* control in the present case. As noted above, in *Matson*, the court decided the defendant did not invoke his right to remain silent when he refused to answer questions about one person, but did not insist on terminating questioning altogether. 260 Kan. at 376. In the present case, too, Donesay did not insist on terminating questioning altogether. First, he said he wanted to give his side of the story, but at a later time. Then he avoided answering questions about shooting Officer Easter but willingly continued answering when the police changed subjects. As already noted, the trial judge did not expressly state that Donesay had not invoked his right to remain silent, but all indicators pointed to that decision. The trial judge's decision appears to be in harmony with this court's previous decisions in *Fritschen* and *Matson*.

It also would appear to be consistent with principles set out by the Supreme Court in *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994). In that case, the Court "decide[d] how law enforcement officers should respond when a suspect makes a reference to counsel that is insufficiently clear to invoke the *Edwards* [*v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981),] prohibition on further questioning." 512 U.S. at 454. With regard to this gray area between an effective waiver of the constitutional right and an effective invocation of it, the Court stated:

"To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. [Citation omitted.] Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' [Citation omitted.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. [Citation omitted.] . . .

"Rather, the suspect must unambiguously request counsel. . . . Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation omitted], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 458-59.

The same principle was set forth by this court in *State v. Morris*, 255 Kan. 964, Syl. ¶ 4, 880 P.2d 1244 (1994):

"When a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify whether the suspect is asserting a right to remain silent or to confer with counsel. Although it is good police practice for officers to clarify whether a suspect making an ambiguous statement really wants an attorney, they are not required to ask clarifying questions."

In conclusion, Donesay did not unambiguously say that he would not talk to police. The trial judge's decision in that regard is correct, even given the additional caution that Donesay's age required the trial judge to exercise in reaching it.

We next consider whether the district court should have accepted Donesay's guilty pleas to Counts Two, Three, Four, and Six. The complaint filed against Donesay charged him with six counts—Count One, Capital Murder (Donesay is too young to be subject to the death penalty); Count Two, Theft; Count Three, Criminal Damage to Property; Count Four, Theft; Count Five, Aggravated Robbery; and Count Six, Criminal Possession of a Firearm. At arraignment, defense counsel announced that he would enter guilty pleas on behalf of Donesay on Counts Two, Three, Four, and Six. On Counts One and Five, he entered pleas of not guilty. The State objected to Donesay's splitting up the pleas. After reviewing the case law and hearing arguments of counsel, the trial court concluded that the defendant had neither a constitutional

nor a statutory right to enter a plea of guilty to some, but not all, of the charges contained in the single complaint against him. Accordingly, the trial court entered pleas of not guilty on behalf of the defendant on all counts.

On appeal, Donesay contends that the trial court has no discretion to deny a plea that is voluntary and knowing and based on facts. He relies on K.S.A. 22-3210 for authority and suggests that this court's review is unlimited because it involves only an interpretation of that statute.

K.S.A. 1997 Supp. 22-3210 provides, in part:

"(a) Before or during trial a plea of guilty or *nolo contendere may be accepted* when:

(1) The defendant or counsel for the defendant enters such plea in open court; and

(2) in felony cases the court has informed the defendant of the consequences of the plea, including the *specific sentencing guidelines level of any crime committed on or after July 1, 1993*, and of the maximum penalty provided by law which may be imposed upon acceptance of such plea; and

(3) in felony cases the court has addressed the defendant personally and determined that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea; and

(4) the court is satisfied that there is a factual basis for the plea." (Emphasis added.)

The statute expressly permits the trial court's accepting a plea of guilty; it does not expressly require the trial court to accept a plea of guilty in any circumstances. In the only Kansas case that seems to involve the issue of whether a district court must accept a guilty plea, *State v. Clanton*, 5 Kan. App. 2d 77, 612 P.2d 662 (1980), the Court of Appeals held that "in felony cases, the decision to accept or reject a plea of guilty after the requirements of K.S.A. 22-3210 have been satisfied is within the sound judicial discretion of the trial judge."

Donesay cites a number of cases from the courts of other states but does not mention *Clanton* and has not favored the court with suggestions for distinguishing it from the present case. Clanton tendered a plea of guilty to the charge of attempted rape but refused to admit the alleged facts of the crime and denied committing

the offense. The trial court refused to accept the plea. The Court of Appeals stated:

"To grant the relief which defendant seeks in this case would require adoption of a rule making it an abuse of judicial discretion for the court to reject a plea of guilty when a defendant not only refuses to admit the alleged facts of the crime, but denies that he committed the crime. We are not inclined to do so . . . ." 5 Kan. App. 2d at 81-82.

In the present case, Donesay's guilty pleas were tendered along with defense counsel's representation with respect to each that "Mr. Donesay acknowledges the acts charged." The question in this case, therefore, does not involve the defendant's protesting his innocence of any of the offenses he attempted to plead guilty to. This is an important difference between the circumstances in *Clanton* and those in the present case. Clanton was not compelled by the trial court's refusal to accept his plea of guilty to plead not guilty to an offense he admittedly committed. In contrast, Donesay was compelled to plead not guilty to crimes he admitted committing. K.S.A. 22-3209(1) and (3) set out the effects of various pleas in criminal proceedings: "A plea of guilty is admission of the truth of the charge and every material fact alleged therein. . . . A plea of not guilty *denies* and puts in issue *every material fact alleged in the charge.*" (Emphasis added.) If truth-seeking is the aim of the criminal justice system, requiring a criminal defendant who admits committing an offense to appear in open court and formally deny the truth by entering a plea of not guilty does not serve that end.

In the present case, defense counsel wanted to reduce the number of offenses on which the jury would hear evidence. The State objected and claimed that it, too, was a party to the action and, as a party, cannot be deprived of its right to trial by jury by Donesay's waiving his right. In this regard, the State quotes from *State v. Ricks*, 173 Kan. 660, 250 P.2d 773 (1952), which involved the alternatives of trial by jury or trial to the court. Ricks waived trial by jury in a felony case, and the prosecution objected. This court concluded that the defendant's waiver bound neither the State nor the trial court:

"It is true a defendant in a criminal case enjoys the constitutional right or privilege of trial by jury. That is a personal right of which he may not be deprived

against his will. Being a right personal to him he, of course, need not insist upon it for his own protection. In other words he may waive it insofar as he is personally concerned. It does not follow, however, that he, therefore, has a right to compel a court to try his case without the assistance of a jury. The constitution does not grant him such power over the trial court.

"Moreover a defendant is not the only party to the trial. The state has an interest in the subject of trial by jury as a matter of public policy. . . . Defendant's waiver of a personal right does not bind the state or the trial court. " 173 Kan. at 664.

The State does not explain how a defendant's pleading guilty is analogous to a defendant's waiving trial by jury in favor of a trial to the court. In the former circumstance, there would be no trial.

In further support of its insistence on trying Donesay on all, rather than some, of the charges, the prosecution states that all charges "were part and parcel of the same transaction." Thus, the State's contention continues, "[e]vidence of the other crimes would have been res gestae evidence; evidence of the entire transaction," which would have been relevant to the issue of premeditation. In other words, the State contends that the jury would have heard the evidence on Counts Two, Three, Four, and Six even if the trial court had accepted Donesay's tendered guilty pleas on those counts. The two counts that Donesay would have submitted to the jury charged him with Officer Easter's murder and theft of the officer's gun. Those crimes, in all likelihood, would not have been committed had Donesay not had such a high stake in eluding police due to the string of offenses that culminated in being chased by Easter. He had stolen, damaged, and abandoned one car (Counts Two and Three), he was driving another stolen car (Count Four), and he possessed a handgun, which was illegal on account of his status as a juvenile previously adjudicated of committing an offense that would have been a felony if committed by an adult (Count Six). There can be little doubt that when Officer Easter noticed that a headlight was out on the car Donesay was driving and signalled for him to pull over, Donesay tried to elude the officer, not to avoid being stopped for having a faulty headlight, but rather to avoid detection of his serious criminal conduct. Likewise, when Donesay grabbed his gun, leaped from the car, and ran from the officer, and then fought rather than surrendering, he did not do so

to avoid the penalty for a missing headlight. Thus, it would appear that some evidence of the crimes charged in Counts Two, Three, Four, and Six would have been relevant to the murder and possession of the gun. Could defense counsel have regained the upper hand with regard to the strategy of sheltering the jury from some of the evidence by stipulating to certain elements? It would not appear so under this court's rule that an offer to stipulate by either party to a criminal action need not be accepted by the other. See *State v. Colwell*, 246 Kan. 382, 385-86, 790 P.2d 430 (1990); *State v. Wilson*, 215 Kan. 28, Syl. ¶ 4, 523 P.2d 337 (1974). This court also has stated: "In a criminal prosecution the making of an admission by the defendant does not bar the state from proving the fact independently as though no admission had been made." 215 Kan. 28, Syl. ¶ 5.

In the same vein, the State argues that the statutes governing the preliminary stages of a criminal proceeding contemplate that a complaint will contain charges relating to all criminal aspects of a scheme or transaction and that a defendant will plead to the complaint rather than to individual counts. In particular, the State cites K.S.A. 22-2902(6), K.S.A. 22-3205(a), and K.S.A. 22-3206(1). K.S.A. 22-2902(6) provides, in part: "The complaint or information, as filed by the prosecuting attorney . . . shall serve as the formal charging document at trial." K.S.A. 22-3205(a) provides: "Arraignment shall be conducted in open court and shall consist of reading the complaint, information or indictment to the defendant or stating to the defendant the substance of the charge and calling upon the defendant to plead thereto." The State contends that K.S.A. 22-3206(1) reinforces the construction the State advocates:

"A defendant charged with a felony in an information shall appear for arraignment upon such information in the district court not later than the next required day of court after the order of the magistrate binding over the defendant for trial, unless a later time is requested or consented to by the defendant and approved by the court or unless continued by order of the court."

Other statutory provisions offer some support for the defendant's position by downplaying the integrity of a complaint. For instance, K.S.A. 22-3202(1) seems to make it a matter of prosecu-

torial discretion whether offenses based on the same or connected transactions are charged in the same complaint: "Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime." K.S.A. 22-3203 authorizes the district court to "order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment." Moreover, the well-established rule in the courts of this state, based on K.S.A. 22-3202(1), is that "[w]hether a defendant will be tried on separate charges in a single trial is a matter within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. [Citation omitted.]" *State v. Anthony*, 257 Kan. 1003, 1016, 898 P.2d 1109 (1995).

The State has discretion to charge more than one crime in more than one complaint, and the trial court has discretion to grant or deny a defendant's motion to sever multiple counts in a single complaint. No statute that would require the charges in a complaint to be treated as indivisible for pleading purposes has been brought to the court's attention. Thus, no good reason appears to preclude a defendant's entering guilty pleas to some but not all counts in a complaint.

The trial judge expressed concern that the double jeopardy protection against multiple punishments for the same offense might affect prosecution of Counts One and Five if Donesay was permitted to plead guilty to the other charges. The trial judge cited the dissenting opinion in *Ohio v. Johnson*, 467 U.S. 493, 81 L. Ed. 2d 425, 104 S. Ct. 2536 (1984). A grand jury indicted Johnson on one count each of murder, involuntary manslaughter, aggravated robbery, and grand theft based on the shooting death of one person during robbery of his apartment. Ohio state law permitted conviction on only one, not both, of the homicide charges and on only one, not both, of the theft charges. The majority treated involuntary manslaughter and grand theft as lesser included offenses of murder and aggravated robbery. Thus, Johnson's guilty pleas to the charges of the lesser included offenses did not entitle him "to use the Double Jeopardy Clause as a sword to prevent the State from

completing its prosecution on the remaining charges." 467 U.S. at 502. Justice Stevens wrote in the dissenting opinion, in which Justice Marshall joined:

"A conviction based on a plea of guilty has the same legal effect as a conviction based on a jury's verdict. The conviction in this case authorized the State of Ohio to place respondent in prison for several years. As the Court expressly recognizes, 'the Double Jeopardy Clause prohibits prosecution of a defendant for a greater offense when he has already been . . . convicted on the lesser included offense.' *Ante*, at 501. That statement fits this case precisely. Since it is a correct statement of the law, I would affirm the judgment of the Supreme Court of Ohio insofar as it denied the State the right to prosecute respondent on the charge of murder." 467 U.S. at 503.

In this regard, the majority wrote:

"Respondent has not been exposed to conviction on the charges to which he pleaded not guilty, nor has the State had the opportunity to marshal its evidence and resources more than once or to hone its presentation of its case through a trial. The acceptance of a guilty plea to lesser included offenses while charges on the greater offenses remain pending, moreover, has none of the implications of an 'implied acquittal' which results from a verdict convicting a defendant on lesser included offenses rendered by a jury charged to consider both greater and lesser included offenses. [Citations omitted.]" 467 U.S. at 501-02.

Thus, we see that the key to this decision and the difference between the reasoning of the majority and that of the dissenting justices lies in the effect acceptance of a guilty plea to a lesser included offense has on charges of the greater offense. The dissenting justices believed that acceptance of the plea implied acquittal of the greater offense, but the majority did not. With no lesser included offenses charged in the complaint against Donesay, *Johnson* would appear to have no direct application to this case. However, it does address the double jeopardy concern raised by the State.

The trial court cited *State v. Kissner*, 541 N.W.2d 317 (Minn. App. 1995), for its factual similarity to the present case. Kissner was driving in the passing lane when his vehicle collided head-on with the car driven by Julie Bissette. Three people in the Bissette car died, and a fourth was injured. A jury convicted Kissner "of three counts of criminal vehicular homicide; one count of criminal vehicular operation causing substantial bodily harm; one count of careless driving; one count of driving with an open bottle; one

count of driving without a seatbelt; and one count of transporting a child without a child restraint." 541 N.W.2d at 320. Kissner tendered guilty pleas to the misdemeanor charges—open bottle, seatbelt, and child restraint violations. The trial court refused to accept the pleas on the grounds that acceptance would not streamline the case or simplify the fact-finding task of the jury. The appellate court also noted: "The trial court may also have been concerned about double jeopardy consequences resulting from a partial guilty plea." 541 N.W.2d at 325. On appeal, Kissner contended that the trial court's refusal "deprived him of due process and fundamental fairness." 541 N.W.2d at 324. The appellate court disagreed:

" 'Neither the constitution nor our Rules of Criminal Procedure give to a criminal defendant an absolute right to have his plea of guilty accepted.' *State v. Goulette*, 258 N.W.2d 758, 762 (Minn. 1977). Rather, the trial court in its discretion may allow a defendant to plead to less than the entire indictment 'in proper cases.' *State v. Linehan*, 276 Minn. 349, 353, 150 N.W.2d 203, 206 (1967); *see also* Minn. R. Crim. P. 15.04, subd. 3(2) ('The court *may* accept a plea agreement of the parties when the interest of the public in the effective administration of justice would thereby be served.')" 541 N.W.2d at 324-25.

Thus, the appellate court concluded that the trial court's "decision to reject appellant's guilty pleas was not an abuse of discretion." 541 N.W.2d at 325.

*State v. Linehan*, 276 Minn. 349, 150 N.W.2d 203 (1967), cited by the Minnesota Court of Appeals for the rule that whether a trial court accepts a defendant's tender of guilty pleas to fewer than all counts of an indictment is a matter of judicial discretion, involved an indictment that charged the defendant in separate counts with both a greater and lesser degree of murder and kidnapping. At arraignment, defendant "tendered a plea of not guilty to murder in the first degree, guilty to murder in the third degree, and not guilty to kidnapping by reason of double jeopardy." 276 Minn. at 350. The trial judge refused the tender. The State dismissed the indictment and filed an information charging only kidnapping, and defendant pled guilty. On appeal, defendant claimed error in the trial court's

"refusing to sentence defendant upon his plea of guilty to murder in the third degree as charged in the indictment and allowing the state to dismiss the indict-

ment and proceed by information after defendant had already entered a plea to murder in the third degree as charged in the indictment." 276 Minn. at 351.

No error was found. The court stated unequivocally that "the defendant has no absolute right to plead guilty to anything less than the entire indictment." 276 Minn. at 354. The *Linehan* court's reasoning, of course, took into account the practice in that state of charging included offenses in separate counts. In addition, *Linehan* was decided before the Supreme Court settled the question raised in *Ohio v. Johnson*, 467 U.S. 493. In the presence of its state procedural rule and the absence of the *Ohio v. Johnson* rule, the Minnesota court reasoned that a decision allowing a defendant to plead guilty to fewer than all counts would open the door for defendants to select the count carrying the lowest penalty, plead guilty to it, and then set up a double-jeopardy defense to the balance of the indictment.

In the present case, Donesay concludes his argument on this issue by urging the court to "find it was an abuse of discretion for the district court" to refuse to accept his tender of guilty pleas to fewer than all the counts of the complaint. He does not contend that a constitutional right or privilege guarantees acceptance of his guilty pleas. He does contend that his defense strategy to conceal evidence of the nonperson offenses from the jury was foiled and he was prejudiced as a result, but, as discussed above, the evidence would have been admissible as tending to show motive and intent for the murder.

Whether it is within the discretion of a trial court to accept guilty pleas to fewer than all counts of a complaint is an issue that has not been considered by this court. The statutes governing criminal procedure afford no firm answer to the question. Nor is there a firm answer in any case law that has been brought to the court's attention. We agree that a defendant does not have an absolute right to plead guilty to fewer than all counts in the complaint. We see no reason, however, to limit the trial court's discretion in accepting a plea of guilty to fewer than all of the counts. As we previously noted, the reasons stated for not accepting the pleas of guilty in the present case are not valid. Absent a valid reason, the

trial court should accept guilty pleas when the requirements of 22-3210 are satisfied *and* the defendant, unlike the defendant in *Clanton*, admits the truth of the charge and every material fact alleged in it. Refusal to accept the pleas is to be judged by an abuse of discretion standard.

Here, there is no valid reason to reject the defendant's plea of guilty to four of the six counts. Although the trial court did not accept Donesay's tendered guilty pleas, Donesay was not prejudiced as a result, because he "acknowledged the acts" at the time he tendered his pleas, and he admitted the truth of the charges. Because the attention of the trial judge immediately was diverted to the question of whether Donesay could plead guilty to some but not all charges, no inquiries were made about satisfaction of the 22-3210 requirements. Even assuming all conditions were met for allowing Donesay to plead guilty to fewer than all charges in the complaint, however, the trial judge's refusal to accept the tendered guilty pleas would not amount to reversible error because defendant was not prejudiced.

We next consider the admission of the testimony of the victim's widow. Donesay complains about Officer Easter's widow being permitted to testify, over objection, about Easter's relationship with her, other family members, and friends. He contends that the testimony was irrelevant and served only to inflame the passions of the jurors. We agree.

Here, there is no question that the widow's testimony was irrelevant and reversible error. The scope of this court's review of this issue is well established and well known:

"Admission of evidence is entrusted to the sound discretion of the trial court. Discretion is abused only where no reasonable person would take the view adopted by the trial court. Absent a clear showing of abuse of discretion, evidentiary findings of the trial court will not be set aside on appeal." *State v. Sexton*, 256 Kan. 344, Syl. ¶ 2, 886 P.2d 811 (1994).

The State contends that had Officer Easter lived, he could have given testimony that would have acquainted the jury with him "so that it may properly fit him into the pattern of events brought out at the trial." *State v. Stokes*, 215 Kan. 5, 7, 523 P.2d 364 (1974). Because Easter did not live, the State's contention continues, his

widow was entitled to supply that testimony. The language quoted by the State occurs in a passage where the court is discussing K.S.A. 60-447, which provides "that in a criminal case the prosecution may introduce evidence of the accused's bad character 'only after the accused has introduced evidence of his good character.' " 215 Kan. at 6. The person referred to in the passage quoted by the State is, of course, the defendant rather than the victim. The authority cited by the State does not support the proposition that the jury is entitled to know personal details about the victim and his family.

Julie Easter testified in detail as to her relationship with Officer Easter from when the two first met in high school, their first date, and their relationship in college. She testified as to Easter's goals and ambitions and how he chose a career in law enforcement and talked of eventually going to law school. She testified that Easter's brother was also in law enforcement. She recalled the circumstances of becoming engaged to be married, and she identified a photograph of Easter, evidently at their wedding. She was asked to describe Easter:

"A. Kevin was very happy. He was full of life. There was never a dull moment around Kevin. He could—would light up a room when he walked into it. He always had a smile on his face.

"Q. Did his mom have a name for him?

"A. Her happy boy.

"Q. And would that pretty much sum up the way Kevin's personality would come across to people?

"A. Yes. I've heard that a lot lately, that everybody remembers his smile. He was very well-liked and well-respected by all of his peers. When we were in high school, he was the prom king and homecoming king candidate. And, when he went to St. Mary's of the Plains, he was given the award of the most inspirational player for the wrestling team. Everybody he met he left a lasting impression on them."

Mrs. Easter testified as to Easter's interview and acceptance of a position with the Drug Enforcement Administration:

"Q. Was there any question that you had in your mind that your husband was now going to achieve the goal of being a federal agent?

"A. Absolutely.

"Q. And was this something that both of you were quite excited about?

"A. Yes. Very.

"Q. Did he tell anybody?

"A. No. He was modest. He didn't wanna brag.

"Q. Who bragged for him?

"A. We were at a family get-together, and his father announced it. He couldn't hold it in any longer.

"Q. He couldn't keep a secret. When you would spend time with your husband, were there other people that you would be around or associate with?

"A. Yeah. We spent a lot of time with family and lot of time with friends."

She testified in detail as to her family and Christmas visits to her parents in Amarillo, Texas.

Probably the most damaging and inflammatory testimony was her relating their final day together and, in particular, her description of their last kiss:

"Q. Prior to him leaving the residence, did you have any discussion?

"A. Umm, no. We just talked about what was gonna be happening in a week.

"Q. So it'd be just a normal evening; is that correct?

"A. Yes.

"Q. And did you have any routine that you two went through at the time that he left for work?

"A. Every time we left each other, we made a point to kiss for 10 seconds, and we did that.

"Q. [Mrs.] Easter, is that the last time you saw your husband Kevin alive?

"A. (The witness nodded.)

"Q. Yes.

"MS. FOULSTON: I have no further questions."

Mrs. Easter's testimony was extensive and covers 28 pages of the transcript.

We note that the defendant stipulated that the Glock 17 was Officer Easter's weapon, that Easter was a properly uniformed officer, that Easter was the victim, and that defendant had no objection to the State's introducing a picture of Easter.

K.S.A. 60-401(b) provides that "[r]elevant evidence' means evidence having any tendency in reason to prove any material fact." It is beyond clear that Mrs. Easter's testimony was irrelevant, prejudicial, and inflammatory. Her testimony may have been proper at sentencing, but the State's justification for her testimony at trial is meritless, to say the least.

First, had Officer Easter lived, this would not be a case of premeditated murder, and second, had he lived, he could not have testified as did Mrs. Easter. Her testimony was obviously collateral to the charges against the defendant, and there needs to be some natural or logical connection between her testimony and the inference or result her testimony is designed to establish. See *State v. Walker*, 239 Kan. 635, 644, 722 P.2d 556 (1986). Clearly, Mrs. Easter's testimony was not relevant to any material fact of the crimes charged. What is clear is that the inference or result intended was to improperly influence the jury and prejudice the defendant's right to a fair trial. There is no question that the admission of Mrs. Easter's testimony was error. This, however, does not end our inquiry.

The question becomes whether the admission of testimony is reversible error. At oral argument, the State conceded it had no authority to support the admission of such evidence, and its best argument was that it was harmless error.

In *State v. Fleury*, 203 Kan. 888, 893, 457 P.2d 44 (1969), we stated:

"Our Kansas harmless-error rule has been incorporated in the statutory law of this state. (See K.S.A. 60-261 and K.S.A. 62-1718.) Our harmless-error rule applies unless the error is of such a nature as to appear inconsistent with substantial justice. Our courts are directed to disregard any error or defect in the proceedings which does not affect the substantial rights of the parties.

"The federal harmless-error rule declared in [*Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967),] requires an additional determination by the court that such error was harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial."

The court then proceeded to apply the double standard in finding "the error was harmless beyond a reasonable doubt *and* did not affect the substantial rights of the defendant." (Emphasis added.) 203 Kan. at 895.

In *State v. Denney*, 258 Kan. 437, 905 P.2d 657 (1995), this court noted K.S.A. 60-261 and the numerous cases applying the statutory test of whether the substantial rights of a party had been prejudiced. We further stated:

"Although the standard of 'harmless beyond a reasonable doubt' as applied to errors of a federal constitutional magnitude was recognized as more stringent than the one imposed by Kansas statutes, see *State v. Fleury*, 203 Kan. 888, 893, 457 P.2d 44 (1969), in recent years a similar standard has been applied in Kansas to errors not couched as constitutional violations. See *State v. Tyler*, 251 Kan. 616, Syl. ¶ 7, 840 P.2d 413 (1992); *State v. Johnson*, 231 Kan. 151, 159, 643 P.2d 146 (1982)." 258 Kan. at 445.

Other courts have confronted this issue in similar contexts. In *People v. Bernette*, 30 Ill. 2d 359, 197 N.E.2d 436 (1964), as here, the defendant contended that testimony of the victim's widow was irrelevant and highly prejudicial and the purpose was to "infuriate and inflame the jury against him." 30 Ill. 2d at 371. The testimony at issue related to the fact that the victim left a widow with four minor children. Her testimony did not approach the extent and detail of Mrs. Easter's testimony in the present case. The State conceded the testimony was irrelevant but argued that it was not reversible error because the defendant did not object and the objectional evidence was "brought to the jury only incidentally." 30 Ill. 2d at 372. The court found otherwise:

"The evidence in regard to the decedent's child and step-children was not brought to the notice of the jury incidentally, but was presented by a series of questions in such a way as to permit the jury to understand that it was a matter material and proper to be proved. If any doubt existed, it was removed when the prosecutor went to the extreme of eliciting the ages of the children involved. This entire segment of the evidence, having no relevance to guilt or innocence, could only have had the purpose of prejudicing defendant in the eyes of the jury 'and to arouse in them anger, hate and passion.' (*People v. Dukes*, 12 Ill. 2d 334, 340.) What part this inflammatory appeal to the jury played in the selection of the death penalty cannot be known. But defendant, no matter how reprehensible his crime, was entitled to have jurors consider both the matter of his guilt and punishment, uninfluenced by the circumstance that decedent's widow had been left to live alone with children of tender ages as the result of the homicide.

"And while no objection was made by the defense to the admission of such evidence, we believe, apart from considerations of a later claim that defendant's counsel was incompetent for not objecting, *that the irrelevancy and highly prejudicial nature of such evidence is so well established, that it was the duty of the court in a murder case to have refused it on its own motion* (Cf. *People v. Winchester*, 352 Ill. 237; *People v. Blevins*, 251 Ill. 381; *City of Chicago v. Pridmore*, 12 Ill. 2d 447.) It is always the duty of a trial court to control proceedings to insure

that an accused receives a fair and impartial trial." (Emphasis added.) 30 Ill. 2d at 372-73.

In *People v. Logan*, 224 Ill. App. 3d 735, 586 N.E.2d 679 (1991), *Bernette* was discussed and applied:

"The testimony in the present case went far beyond that presented in [*People v. Yates*, 98 Ill. 2d 502, 456 N.E.2d 1369 (1983),] and [*People v. Free*, 94 Ill. 2d 378, 447 N.E.2d 218 (1983)]. Here, as in *Bernette*, the deceased victim's widow testified in response to a series of questions that she had three children, that the children were aged 10, 6, and 3, and that the eldest was not the child of the deceased. In addition, the prosecutor commented on both victims' families in opening and closing argument and a photograph showing the deceased victim with his wife and children was admitted into evidence. It also should be noted that, unlike *Bernette* where no objection was made, here, the testimony concerning the victims' families was admitted over defendant's objections.

. . . .

"In the present case, the evidence and comments complained of were precisely the kind of detailed discussion of the deceased victim's family that has been condemned by the supreme court. And unlike [*People v. Caballero*, 126 Ill. 2d 248, 533 N.E.2d 1089 (1989)], here, the evidence not only was uninvited, it was admitted over the strong objections of defendant. Moreover, in the present case, defendant challenged the sufficiency of the evidence against him in his original appeal and continues to do so in the present appeal.

. . . .

"We find nothing in the supreme court's language that requires us to conclude that introduction of evidence of a victim's family will always constitute harmless error when the death penalty is not imposed. Rather, the court appears to be saying that when the death penalty is not imposed, the question of whether introduction of such evidence constitutes harmless error will depend upon the manner in which the evidence is introduced.

"As noted above, the supreme court has ruled that the evidence in this case was not brought to the jury's attention incidentally but was presented in a manner that permitted the jury to believe it was material. (*Hope*, 116 Ill. 2d at 278.) The court also found that the comments about the victims' families made during opening and closing arguments were not invited by the defense and amounted to an improper appeal to the emotions of the jurors. Thus, the supreme court has already held that the manner in which the evidence was introduced served to prejudice the jury, and we find that the fact that the death penalty was not imposed does not require a different conclusion. See *People v. Tajra* (1965), 58 Ill. App. 2d 479, 208 N.E.2d 9." 224 Ill. App. 3d at 741-43.

In *People v. Gallon*, 121 Mich. App. 183, 328 N.W.2d 615 (1982), the court determined that the eliciting of the officer re-

garding the defendant's asserting his right to remain silent was error. In response to the State's argument that the error was harmless, the court stated:

"The prosecutor also claims that the error was harmless. In determining whether error was harmless, we employ a dual inquiry. First, was the error so offensive to the maintenance of a sound judicial system as to require reversal and second, if not, was the error harmless beyond a reasonable doubt? *People v. Swan,* [56 Mich. App. 22,] pp. 31-32. The purpose of the first criterion is to deter prosecutorial and police misconduct. *People v. Wright (On Remand),* 99 Mich. App. 801, 810-811; 298 N.W.2d 857 (1980). An error may be intolerably offensive to the maintenance of a sound judicial system if it was deliberately injected into the proceedings by the prosecutor, if it deprives the defendant of a fundamental element of the adversary process, or if it is of a particularly inflammatory or persuasive kind. *People v. Swan, supra,* p. 32. The purpose of the second criterion of the harmless error test is to safeguard the decisional process. Thus, if it is reasonably possible that in a trial free of the error complained of even one juror would have voted to acquit, the error was not harmless." 121 Mich. App. at 188-89.

In the present case, we apply a similar dual test in determining if the admission of Mrs. Easter's testimony was harmless. *State v. Sanders,* 258 Kan. 409, 418, 904 P.2d 951 (1995). First, we must determine if the admission of the evidence was inconsistent with substantial justice, *i.e.,* whether substantial rights of defendant were affected by the admission of Mrs. Easter's testimony. Second, if not, can we declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial?

Here, the district attorney not only had Mrs. Easter testify, but also in her opening statement, over defendant's objection, told the jury in great detail what Mrs. Easter's testimony would be. The testimony was patently irrelevant and deliberately presented for the obvious purpose of inflaming the jury against the defendant. As such, it affected the defendant's right to a fair and impartial trial.

As we previously discussed, the defendant offered to plead guilty to all charges except premeditated murder and aggravated robbery. The primary issue in the trial was whether the killing of Officer Easter was done with premeditation. The defendant did not deny he shot Officer Easter. There is no question of the defendant's involvement in this tragic occurrence. His offer to plead guilty to

four counts was opposed by the State. Notwithstanding, the State intentionally injected the irrelevant and highly prejudicial testimony of Mrs. Easter into this trial. Her testimony was not relevant to any of the charges, but it was offered and admitted by the court as if it were. The jury could not consider the evidence fairly and impartially as to any of the charges. However, the only real question was whether the killing of Officer Easter was premeditated. The defendant basically admitted to everything except that he premeditatedly killed Officer Easter. Defendant, in his brief, noted:

"There was no independent substantial and uncontroverted evidence of Donesay's premeditated intent to kill Easter. There were no witnesses. There was no medical evidence as to the order in which Easter received the bullet wounds, whether it was the first shot or last that killed him. Officer Bowker testified at trial he heard two shots, a short pause, and two more shots. He conceded, however, that he had not mentioned the pause in his initial report, and that in a subsequent police interview he described the shots as being fairly rapid. He did not tell anyone about the pause in the cadence of the shots until after he met with the prosecutor. . . .

"There was no question the incident took place in a very short period of time. Donesay himself testified he did not intend to kill Easter. He testified he just got mad and shot Easter without thinking."

The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant. We cannot objectively conclude the admission of the testimony was harmless error. The district attorney's insistence in presenting this testimony to the jury, and the trial court's allowing her to do it, affected the substantial rights of the defendant to a fair and impartial trial. Thus, we have no choice but to reverse the defendant's convictions.

Because we reverse, the matter must be retried. We therefore do not consider the remaining issues raised by Donesay.

Affirmed in part, reversed in part, and remanded for a new trial.