IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,162

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH DATHIAN MATTOX,
*Appellant.*

SYLLABUS BY THE COURT

1.

Any fact that increases a mandatory minimum sentence must be submitted to a jury and proved beyond a reasonable doubt.

2.

Jurors are presumed to follow the instructions they receive in the district court.

3.

When a defendant is charged with a homicide in the death of one person, the facts cannot give rise to multiple counts of the charged crime and do not support a multiple acts appellate challenge.

4.

A district court has discretion to accept or reject a no contest plea. However, a district court should accept a no contest plea when the requirements of K.S.A. 22-3210 are met and the defendant does not contest the charge.

5.

To establish the excited utterance exception to the hearsay rule, a party must show: (1) an event or condition occurred; (2) it was startlingly sufficient to cause nervous excitement; (3) the declarant perceived it; and (4) the declarant made the statement while under stress of nervous excitement.

6.

To invoke the Fifth Amendment right to counsel, a suspect must articulate the desire to have counsel present with sufficient clarity such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

7.

Whether a *Miranda* waiver was knowing, voluntary, and intelligent is determined based on the totality of the circumstances. In making such determination, this court considers the following nonexclusive factors: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency in the English language. The essence of such inquiry is to determine whether the accused's statement was the product of free and independent will.

8.

An accused does not have a Sixth Amendment right to have counsel present during a psychiatric evaluation.

Appeal from Johnson District Court; JAMES FRANKLIN DAVIS, judge. Opinion filed March 10, 2017. Convictions affirmed, sentence vacated, and remanded with directions.

*Catherine A. Zigtema*, of Law Office of Kate Zigtema LC, of Lenexa, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, senior deputy district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Joseph Mattox directly appeals his conviction and hard 50 sentence for the first-degree premeditated murder, aggravated kidnapping, and aggravated robbery of Keighley Alyea in September 2009 in Johnson County. We affirm Mattox's convictions; however, we vacate Mattox's hard 50 sentence and remand for resentencing because the district court, rather than the jury, found the existence of aggravating factors by a preponderance of the evidence, rather than beyond a reasonable doubt, in violation of *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).

## FACTUAL AND PROCEDURAL BACKGROUND

We recited the basic facts of Alyea's brutal murder when we affirmed the conviction (following a separate trial) of Mattox's codefendant and cousin Dustin Hilt.

"Johnson County detectives found the body of Hilt's ex-girlfriend, Keighley Alyea, in a field in Cass County, Missouri. Alyea had been stabbed dozens of times with a knife. Her body also showed signs that she had been asphyxiated and had suffered blunt-force trauma to her head.

"Six days before Alyea's body was discovered, she had invited Jessika Beebe; Beebe's daughter; and Beebe's boyfriend, Shawn Merritt, to spend the night at her apartment. Beebe and Merritt did not feel safe staying at Beebe's residence because they

3

feared Beebe's brother, James. Two days earlier, James had intentionally rammed his vehicle into Alyea's vehicle and threatened to 'shoot [Merritt's] house up.' James was later arrested in connection with this incident.

"Merritt was so concerned about James' threat that he told Alyea he needed to get a gun for protection. Alyea suggested to Merritt that he contact Hilt. That night Merritt used Alyea's phone to send a text message to Hilt to ask if Hilt knew where to get a gun. After a series of text messages between Hilt and Merritt, Hilt asked for a ride. Merritt returned the phone to Alyea, and Hilt sent two additional messages requesting a ride. Alyea then sent a message identifying herself and asked Hilt if he wanted to 'come kick it.' Hilt again said he needed a ride. Shortly after 1 a.m., Alyea agreed to pick Hilt up and asked if he was with anyone else. Hilt responded that he was with Scott Calbeck. Before Alyea left to meet Hilt, Beebe advised her not to go.

"About 2 a.m., Hilt; Calbeck; and Hilt's cousin, Joe Mattox, entered a QuikTrip convenience store. . . . Meanwhile, Alyea, who was waiting in her car outside the convenience store, called her stepsister. Alyea accused the stepsister of having had sex with Hilt, threatened to beat her up, and then hung up. A heated text message exchange between Alyea and the stepsister followed—full of threats, name calling, and other insults. Alyea sent her last text message at 2:50 a.m. The stepsister would later testify that she had sent a text message to Alyea at 2:53 a.m. and expected it to elicit an immediate response. Instead, no response ever came.

"When Beebe woke up about 11 a.m., Alyea was not in the apartment. Beebe tried calling Alyea multiple times. When that was unsuccessful, she called Alyea's family and checked at Alyea's work, the hospital, and the jail. She did not find her.

"The Overland Park Police Department began a missing person investigation. Sergeant Thomas Smith interviewed Hilt and asked when Hilt last talked with Alyea. Hilt said it had been several weeks or months. When presented with a printout of Alyea's text message correspondence, Hilt admitted that he had recently communicated with Alyea, but he maintained that the two had not seen each other recently.

4

"The next day, police officers discovered Alyea's car in an apartment parking lot. When they opened the trunk, they found pooled blood and bloody clothing. During processing of the car at the Johnson County Sheriff's Office crime lab, a technician found a knife under bloody clothing in the trunk. The technician also noted that the car's taillight assemblies had been loosened from their mounts, and the connecting tabs had been disconnected, disabling the taillights. Both the taillight connectors and the trunk latch had smears of blood on them. Crime scene investigators did not initially link the knife to Alyea's disappearance or death.

"The day after Alyea's vehicle surfaced, detectives conducted a search at Mattox's residence. They found a piece of charred metal pipe in a smoker grill, as well as other charred and burned items. A can of gasoline sat next to the smoker grill. In the basement, detectives opened a dishwasher and discovered a black plastic trash bag full of bloody clothing.

"The same day, Alyea's body was found. Its condition had been damaged by decomposition and insects." *State v. Hilt*, 299 Kan. 176, 179-181, 322 P.3d 367 (2014).

Alyea's body had been found in Cass County, Missouri, approximately 4 miles from Mattox's father's home. An autopsy revealed a total of 20 stab wounds and several larger blunt force trauma injuries to Alyea's head and neck. Either the blunt force trauma causing a skull fracture or any of the stab wounds could have caused her death. Subsequent forensic analysis tied the DNA profiles of Mattox and Alyea to the same bloodstained clothing.

During the investigation, police interviewed Mattox. He initially denied having any knowledge about the killing. But a few days later, Mattox made a full confession, describing the course of events in detail. According to Mattox's confession, while in the QuickTrip, he, Hilt, and Scott Calbeck had hatched a plan to rob Alyea. When Alyea and her killers left QuickTrip, Hilt was driving, Alyea was in the front seat, and Mattox and Calbeck were in the back seats. Soon after, Mattox and Calbeck attacked Alyea—they

5

beat her with their fists, and Mattox dragged Alyea to the back seat, struck her with a pipe, and choked her. When Alyea stopped struggling, Mattox told Hilt to stop the car. They put Alyea in the trunk and kept driving. Mattox proposed disposing the car and Alyea's body in a rural area he knew.

The group pulled over near Harrisonville, Missouri, when they heard Alyea screaming for help in the trunk. They pulled Alyea out of the trunk, and Calbeck beat her again with the pipe. Hilt stabbed Alyea twice in the abdomen with a hunting knife that he took from Mattox's residence. The three men loaded Alyea's limp body back into the trunk and later dumped it in a field.

The group drove back to Overland Park, Kansas, to clean Alyea's car and dispose of the evidence. Mattox removed the battery from Alyea's cell phone and threw it out the car window. The group divided up cleaning tasks—Mattox was responsible to clean the car trunk, and Hilt planned to discard the clothing and the knife. The group abandoned Alyea's car in an apartment parking lot, returned to Mattox's house, and burned Alyea's purse on a grill.

Pretrial, Mattox moved to suppress his confession, but the district court denied the motion. A jury found Mattox guilty of premeditated murder under an aiding and abetting theory, as well as aggravated kidnapping and aggravated robbery. The district court imposed a hard 50 sentence for first-degree murder pursuant to K.S.A. 21-4635 (recodified at K.S.A. 2015 Supp. 21-6620) without fact-finding by the jury.

Mattox now appeals his convictions and sentence. We exercise jurisdiction pursuant to K.S.A. 2015 Supp. 22-3601(b)(3) (direct appeal to Supreme Court when life sentence imposed).

6

*1. Mattox was sentenced in violation of the Sixth Amendment to the United States Constitution.*

Mattox first claims that his Sixth Amendment right to a jury trial was violated when the district court imposed a hard 50 sentence without fact-finding by the jury. He argues his hard 50 sentence is unconstitutional because the sentencing judge found the existence of aggravating factors by a preponderance of the evidence, in violation of *Alleyne*, 133 S. Ct. 2151. The State concedes this point. We likewise hold that the imposition of Mattox's hard 50 sentence violated his Sixth Amendment right.

The constitutionality of a sentencing statute is a question of law over which this court exercises unlimited review. *Hilt*, 299 Kan. at 202.

"Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 133 S. Ct. at 2155. Therefore, "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." 133 S. Ct. at 2155.

In *Hilt* the district court likewise imposed a hard 50 sentence without fact-finding by the jury. We found this sentencing scheme ran afoul of *Alleyne*, stating:

> "Were it not for the sentencing judge's finding by a preponderance of the evidence of four aggravating factors, Hilt would not have faced a minimum sentence of 50 years rather than 25 years for Alyea's murder. Because the judge, rather than the jury, found the four aggravating factors existed, and did so on a preponderance-of-the-evidence rather than a beyond-a-reasonable-doubt standard, Hilt's Sixth Amendment right to a jury trial, as interpreted in *Alleyne*, was violated." 299 Kan. at 203.

Furthermore, we concluded that *Hilt* was not one of the rare cases where a hard 50 *Alleyne* error can be declared harmless. 299 Kan. at 204-05 ("[W]e cannot say on the

7

record before us that (1) proof of the aggravators was so overwhelming that their existence was certainly established, and (2) no rational factfinder would decide beyond a reasonable doubt that the mitigators advanced by Hilt outweighed the State's aggravators.").

*Hilt* is determinative of this issue—the district court's imposition of a hard 50 sentence violated Mattox's right to a jury trial, and such error was not harmless. Therefore, Mattox's hard 50 life sentence is vacated and the case is remanded to district court for resentencing.

2. *The jury instructions were proper.*

Mattox raises several challenges to the jury instructions. He first contends that the district court erred by refusing to modify the aiding and abetting instruction to inform the jury that before convicting on the State's aiding and abetting theory, the jury was required to find that Mattox had the same premeditation as the principal. Second, he contends that the intent instructions were misleading and lessened the State's burden of proof for premeditated murder. Finally, he contends he was entitled to a multiple acts instruction. Considering each claim in turn, we find no error.

Our review of challenges to jury instructions follows a familiar progression:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the

8

appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [___ U.S. ___,] 132 S. Ct. 1594 [182 L. Ed. 2d 205] (2012)'. [Citation omitted.]

"'Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. [Citation omitted.] And if that defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. [Citations omitted.]'

"We examine 'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" *Hilt*, 299 Kan. at 184-85.

Count I of the indictment charged Mattox with first-degree premeditated murder. Alyea died from multiple blunt and sharp force injuries. Mattox's defense theory was that his intent was merely to rob the victim and that when they initially placed her in the trunk of the vehicle, the plan was to leave her unconscious by the side of the road. According to Mattox's confession, after the victim regained consciousness in the trunk and began screaming, Calbeck beat her with a pipe and Hilt stabbed her with a hunting knife. The State's theory of the crime was that Mattox acted as an aider and abettor during the course of events, which made him culpable for Calbeck's and Hilt's actions, as well as for Alyea's death.

Jury instruction number 10, which was based on PIK Crim. 3d 54.05 relating to aiding and abetting, said:

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

9

In lieu of this instruction, defense counsel submitted a proposed jury instruction that simply stated, "For Joseph Mattox to be convicted of Count I on the theory of aiding and abetting, the defendant must have had the same premeditation to commit the crime as the principal." Defense counsel generally argued that the State's proposed instruction was going to confuse the jury and then cited our decision in *State v. Overstreet*, 288 Kan. 1, 200 P.3d 427 (2009). The State responded with its own case—*State v. Engelhardt*, 280 Kan. 113, 119 P.3d 1148 (2005)—which it believed cautioned courts against modifying the aiding and abetting PIK instructions. The trial court agreed with the State that the PIK-based instruction appropriately defined aiding and abetting but told the parties that they were free to argue "that point to the jury in your closing arguments."

During deliberations, the jury submitted a question asking the court to "add clarification" to the aiding and abetting instruction. With the jury in recess and Mattox present, the trial judge discussed the request with the parties. The State argued that the district court should simply direct the jury's attention back to instruction number 10. Mattox's counsel responded, "Judge, I agree. The question appears to ask for a clarification on the issue of aiding and abetting. I believe that the instructions were as provided, and the Court—That's what the jury will need to rely on."

After bringing in the members of jury, the judge informed them that the "instructions are complete" and that "[t]here's really no further definition or clarification that I can present to you concerning that[,] [s]o you'll have to accept the instructions as I've given them to you."

On appeal, Mattox maintains that he was entitled to his version of the aiding and abetting instruction. To that end, Mattox contends that his proposed instruction was a

correct statement of law and that it was factually appropriate in light of the statements he made to officers indicating that "he only intended to participate in a robbery which spiraled out of control."

We recently addressed a similar situation arising from Hilt's trial. There, Hilt requested a supplement to the aiding and abetting instruction that informed jurors "'[m]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor.'" *Hilt*, 299 Kan. at 183. The district court denied the request and gave PIK Crim. 3d 54.05 without the supplement. On appeal, Hilt argued—as Mattox does—that PIK Crim. 3d 54.05 left the jury with an incomplete understanding of the law defining aiding and abetting. We disagreed:

> "In this case, the district judge's use of PIK Crim. 3d 54.05 on aiding and abetting—given without requested additional language about mere association or presence being insufficient to convict—was not reversible error. But inclusion of the additional language is the better practice; and, in future cases, when the additional language is requested, the judge should modify the PIK instruction." 299 Kan. 176, Syl. ¶ 1.

We cautioned that although it was not reversible error to not provide the additional language, "the better practice is to add the requested language in cases such as this, and failure to do so may imperil convictions in *future* similar cases." (Emphasis added.) 299 Kan. at 185-86. Obviously, *Hilt* had not been decided at the time of Mattox's trial.

Prior to Mattox's trial, however, we had decided *Overstreet*, 288 Kan. 1. The State had charged Overstreet with aggravated assault and attempted first-degree murder, both based on an aiding and abetting theory. The district court provided the following jury instructions based on PIK Crim. 3d 54.05 (aiding and abetting) and PIK Crim. 3d 54.06 (responsibility for crimes of another), respectively:

11

"'A person who, either before or during its commission, intentionally aids, abets or procures another to commit a crime with the intent to promote or assist in its commission, is criminally responsible for the crime committed regardless of the extent of the person's participation, if any, in the actual commission of the crime. [PIK Crim. 3d 54.05.]

"'A person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable. [PIK Crim. 3d 54.06.]'" 288 Kan. at 8.

The prosecutor made a series of statements during closing arguments that Overstreet claimed—when taken in combination with the PIK instructions—relieved the State of its burden of proving premeditation beyond a reasonable doubt.

Initially, we observed that we had approved each of the two instructions individually as correct statements of K.S.A. 21-3205 (providing the statutory definition of aiding and abetting). But we also noted that *Engelhardt*, 280 Kan. 113, held that it was error to provide both instructions when the underlying crime required a showing of specific intent. *Overstreet*, 288 Kan. at 10. We reasoned in *Engelhardt* that a foreseeability instruction would impermissibly relieve the State of the burden to prove a specific intent because the concept of foreseeability essentially converted the State's aiding and abetting theory into an uncharged and uninstructed upon theory of felony murder. See *Engelhardt*, 280 Kan. at 133; *Overstreet*, 288 Kan. at 11. We "ultimately held in *Engelhardt* that although it was error for the district court to give the foreseeability instruction contained in PIK Crim. 3d 54.06, the error was harmless in light of the overwhelming evidence against the defendant." *Overstreet*, 288 Kan. at 11 (citing *Engelhardt*, 280 Kan. at 133-34).

12

In *Overstreet*, we clearly elucidated this principle:

"Our decision in *Engelhardt* controls our resolution in this case. As in *Engelhardt*, Overstreet was charged in this case with a specific-intent crime under an aiding and abetting theory. Therefore, the State was required to prove beyond a reasonable doubt that he 'intend[ed] to promote or assist' in the commission of an attempted first-degree premeditated murder. [Citations omitted.] *Engelhardt* makes it clear that to be successful on this theory, the State was required to prove that the defendant shared in the specific intent of premeditation and thus promoted or assisted in the commission of the specific crime of premeditated first-degree murder.

"Despite this premeditation requirement, the district court instructed the jury in this case that '[a] person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable.' This foreseeability instruction indicated that the jury need not find that Overstreet possessed the specific intent of premeditation if it found that premeditated murder was a reasonably foreseeable consequence of aggravated assault. In other words, giving the aiding and abetting foreseeability instruction negated the State's burden to prove an essential element of the crime charged: premeditation. This diminished burden is precisely the type of error disproved in *Engelhardt*. [Citation omitted.] The district court erred when it provided the foreseeability instruction in this case." 288 Kan. at 11-12.

Although Mattox relies on *Overstreet* and *Engelhardt*, his argument ignores a significant difference between those cases and his. The trial court in those cases provided the jury with both PIK Crim. 3d 54.05 and PIK Crim. 3d 54.06, while only PIK Crim. 3d 54.05 was provided here. Indeed, the crux of the reasoning in *Overstreet* and *Engelhardt* on these issues is that the foreseeability language in PIK Crim. 3d 54.06 confuses the jury about the level of intent a defendant must have when it is combined with an aiding and abetting instruction. See *Overstreet*, 288 Kan. at 11-15; *Engelhardt*, 280 Kan. at 132-34.

13

We have articulated this distinction before. In *State v. Betancourt*, 299 Kan. 131, 322 P.3d 353 (2014), the defendant was convicted of first-degree premeditated murder on an aiding and abetting theory. As here, the jury in *Betancourt* was provided with PIK Crim. 3d 54.05 and a similar first-degree murder instruction. Betancourt argued that "these instructions were deficient because they did not inform the jury that a defendant who is guilty on an aiding and abetting theory of premeditated murder must share the principal's premeditated intent." 299 Kan. at 135. We stated:

> "[Betancourt]'s case differs significantly from *Overstreet* and *Engelhardt* in that the second part of the aiding and abetting instruction—the part negating the intent portion—was not given here. Instead, in this case the jury was given Instructions 7 and 8, which explicitly required the jury to find that [Betancourt] intended to aid and abet in a killing done with premeditation. [Citation omitted.] Considering the entirety of the jury instructions, we conclude that the instructions as given accurately stated Kansas law and did not mislead or confuse the jury." *Betancourt*, 299 Kan. at 136.

Likewise, the premeditated first-degree murder instruction here told jurors that the State had to prove that Mattox "intentionally killed" the victim and that "such killing was done with premeditation." Instruction 12 explained as follows:

> "'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

> "'Intentionally' means conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose.'"

14

Our holding in *Betancourt* that this combination of instructions accurately states Kansas law and does not mislead or confuse the jury remains sound and squarely applicable in the instant case. We find no error in the aiding and abetting instructions as given.

Mattox next argues that the intent instructions—particularly the "inference of intent" instruction—were misleading because they blurred the line between his general and specific intent charges, which erroneously lessened the State's burden of proof for premeditated murder. As Mattox correctly states, premeditated first-degree murder and aggravated kidnapping charges are specific intent crimes, but aggravated robbery is a general intent crime. See *Overstreet*, 288 Kan. at 11 (specific intent required for first-degree premeditated murder); *State v. Robinson*, 303 Kan. 11, 254, 363 P.3d 875 (2015) (specific intent required for aggravated kidnapping), *cert. denied* 137 S. Ct. 164 (2016), *disapproved of on other grounds by State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016); *State v. Edwards*, 299 Kan. 1008, 1015, 327 P.3d 469 (2014) (general intent required for aggravated robbery).

Mattox did not object to the instructions as given, and therefore, we apply a clear error analysis. See *Betancourt*, 299 Kan. at 135. In such an analysis, we first apply a de novo review when determining whether the instruction was legally appropriate. If the court finds that the instruction was erroneous, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.'" *State v. Cooper*, 303 Kan. 764, 769-70, 366 P.3d 232 (2016) (quoting *State v. Soto*, 301 Kan. 969, Syl. ¶ 10, 349 P.3d 1256 [2015]).

The State correctly points out that we have consistently rejected Mattox's argument. Most recently in *State v. Adams*, 292 Kan. 60, 253 P.3d 5 (2011), the defendant claimed the jury instructions on criminal intent and premeditation

15

impermissibly lowered the State's burden to prove premediated first-degree murder. The jury in *Adams* was instructed on (1) premeditated first-degree murder; (2) the definitions of intentionally, willfully, and heat of passion; and (3) the inference of intent.

Adams argued that notwithstanding the definitions and the premeditated first-degree murder instructions, the inference of intent instruction allowed the jury to infer that Adams intended to kill the victim simply because he committed an act that led to the victim's death, thereby lessening the State's burden to prove beyond a reasonable doubt that Adams premeditated the killing. Noting that Adams' argument had been consistently rejected, we concluded that "the instructions clearly advised that the intent to kill and premeditation were separate elements and that the State was required to prove both." 292 Kan. at 79 (citing *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 4, 221 P.3d 1105 [2009]; *State v. Stone*, 253 Kan. 105, 107, 853 P.2d 662 [1993]; *State v. Harkness*, 252 Kan. 510, 525-27, 847 P.2d 1191 [1993]; *State v. Hernandez*, 44 Kan. App. 2d 524, Syl. ¶ 4, 239 P.3d 103 [2010]).

We again reject this claim of error. Instruction 11 clearly advised the jury that the intent to kill and premeditation were separate elements, both of which the State was required to prove. The instruction specifically said that the State had to prove "the defendant intentionally killed Keighley Ann Alyea" and "[t]hat such killing was done with premeditation." Instruction 12 separately instructed jurors on the definitions of "premeditation" and "intentionally." Instruction 6 clearly informed the jury that the State, rather than the defendant, has the burden to prove every element beyond a reasonable doubt. "We generally presume jurors follow the instructions given them in the district court." *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011); see *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 643, 645, 193 L. Ed. 2d 535 (2016) ("The reality is that jurors do not 'pars[e] instructions for subtle shades of meaning in the same way that lawyers might.'"). The intent instructions were proper.

16

Finally, Mattox claims the trial judge's refusal to give the requested multiple acts instruction was error. The requested instruction—following the PIK—would have presumably provided: "The State claims distinct multiple acts which each could separately constitute the crime of first-degree murder. In order for the defendant to be found guilty of first-degree murder, you must unanimously agree upon the same underlying act." See PIK Crim. 3d 68.09-B. When asked why the instruction was appropriate, Mattox's counsel responded, "I mean there's three boys that—The Jury has to agree on who did what." The district judge responded, "But I think the State's theory is aiding and abetting. So as long as the intent is premeditation, they're all in this together so to speak. . . . They're all charged with the behavior of each as long as they had the intent to accomplish the objective here."

> "'Unanimity instruction errors are reviewed under a three-part framework. First, the reviewing court determines whether a multiple acts case is presented. The threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. [Citation omitted.] This is a question of law subject to unlimited review. [Citations omitted.] If the case is a multiple acts case, the next question is whether error was committed. To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge. Failure to elect or instruct is error. Finally, the court determines whether the error was reversible or harmless. [Citation omitted.]'" *State v. Castleberry*, 301 Kan. 170, 185-86, 339 P.3d 795 (2014).

We first consider whether Mattox can satisfy the threshold question—"whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime." *State v. King*, 299 Kan. 372, 379, 323 P.3d 1277 (2014). Mattox asserts that this is a multiple acts case because there were three distinct assaults that took place at different times, at different locations, following a period of time during which the defendants were driving around in the car. According to Mattox, each defendant was motivated by a fresh impulse for the different assaults.

17

We explained in *King* that

> "[A]cts are multiple acts if they are factually separate and distinct. And incidents are
> factually separate when independent criminal acts have occurred at different times or
> different locations or when a later criminal act is motivated by a 'fresh impulse.' [Citation
> omitted.] Factually separate and distinct incidents are not what this court calls 'unitary
> conduct.' [Citation omitted.] The factors we have used to determine the existence of
> unitary conduct are: '(1) whether the acts occur at or near the same time; (2) whether the
> acts occur at the same location; (3) whether there is a causal relationship between the
> acts, in particular whether there was an intervening event; and (4) whether there is a fresh
> impulse motivating some of the conduct.'" 299 Kan. at 379.

This court has recognized, however, "'[t]here is no single test for whether conduct constitutes one act or separate and distinct multiple acts. A test that applies to kidnapping may not apply to possessing a controlled substance.'" *State v. Foster*, 290 Kan. 696, 713, 233 P.3d 265 (2010) (quoting *State v. Allen*, 290 Kan. 540, 544, 232 P.3d 861 [2010]). Ultimately, "the courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues." *State v. Colston*, 290 Kan. 952, 962, 235 P.3d 1234 (2010).

*State v. Soto*, 299 Kan. 102, 322 P.3d 334 (2014), is particularly relevant. Like *Mattox*, the events in *Soto* took place over the course of an evening. Soto was convicted of first-degree premeditated murder on a theory of aiding and abetting. Soto made a multiple acts challenge to his conviction. We stated:

> "Regardless of whether the State proved Soto acted as a principal or an aider and
> abettor, this case cannot be a multiple acts case because there was only one killing. Stated
> another way, none of the 'acts' Soto relies upon to support his multiple acts argument are
> factually and legally sufficient to satisfy all of the elements of first-degree premeditated
> murder. [Citations omitted.]" 299 Kan. at 111.

18

More recently in *State v. Sprague*, 303 Kan. 418, 362 P. 3d 828 (2015), we plainly stated, "When a defendant is charged with a homicide in the death of one person, the facts cannot, *under any circumstances*, give rise to multiple counts of the charged crime and thus do not support a multiple acts appellate challenge." (Emphasis added.) 303 Kan. 418, Syl. ¶ 1; see *State v. Littlejohn*, 298 Kan. 632, 649, 316 P.3d 136 (2014) (codefendant's acts of shooting victim and then running him over with a Hummer did not constitute multiple acts supporting felony-murder charge against defendant because those actions could not have given rise to multiple counts of felony murder); *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005) (kidnapping was a continuous incident that could not be factually separated despite the fact that the event transpired over several hours, the victim was moved from one location to another, and the victim was momentarily free during an attempted escape). Our decisions in *Soto* and *Sprague* foreclose Mattox's argument. Mattox cannot make the threshold showing that this is a multiple acts case.

*3. Mattox was not deprived of his right to present his defense.*

Mattox alleges he was deprived of his right to present a defense because the district court refused to accept Mattox's no contest plea to two of the lesser charges and because the court excluded certain evidence.

Before trial, Mattox attempted to plead no contest to the charges of aggravated kidnapping and aggravated robbery. On appeal, Mattox argues the district court abused its discretion by refusing to accept his no contest pleas and deprived him of his statutory and constitutional right to present his defense. He claims the district court failed to conduct the required K.S.A. 22-3210 colloquy and made an erroneous conclusion of law by deciding that his mental defect defense would serve as a complete defense. We

19

conclude a court could reasonably conclude that, given Mattox's mental defect defense, there was not a factual basis for the no contest pleas, rendering completion of the K.S.A. 22-3210 colloquy unnecessary.

Refusal to accept a no contest plea is reviewed for abuse of discretion. See *State v. Donesay*, 265 Kan. 60, 82, 959 P.2d 862 (1998). "A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 (2015). However, a district court's refusal to accept a no contest plea does not amount to reversible error unless the defendant was prejudiced. See *Donesay*, 265 Kan. at 82.

At a pretrial conference, Mattox tendered a no contest plea to the charges of aggravated kidnapping and aggravated robbery. The district court hesitated, voicing concern with Mattox's attempt to claim a mental defect defense to intent on Count I, premeditated murder, while pleading no contest to intent on Counts II and III, aggravated kidnapping and aggravated robbery. In light of Mattox's anticipated mental defect defense, the court questioned whether it had a sufficient factual basis to accept Mattox's no contest pleas.

"The Court: Here's my issue. As I understand, the defense has some professional witnesses coming here to tell the Court and the jury that Mr. Mattox suffers some mental issues here and such maybe negates this trial. Wouldn't that also impact his plea if the Court is of the opinion that he has some issues in this regard?

"[Defense Counsel]: Your Honor, if you make a finding that Mr. Mattox is—that he's not competent to stand trial, that's fine if you make that finding. Our evidence regarding Mr. Mattox's state of mind at the time of these events is a matter of trial strategy and Defense strategy regarding the extent that we use that evidence and to what arguments we make. To enter his plea today, all that's required is that a factual basis be present. The State should be able to provide a factual basis. Otherwise, there's no point in proceeding on these charges at all. And that you make findings that Mr. Mattox is

20

competent to enter his plea today, that he's going to knowingly and voluntarily, and that you fully advise him of the circumstances and sentences that he exposes himself to by entering a no contest plea to Counts 2 and 3.

"[The State]: . . . My whole point is can you accept a plea when someone is claiming that they didn't have the mental state to commit the crime?

"The Court: That's why I'm sort of hesitating. Because I anticipate—In the pretrial orders, I heard about the mental problems Mr. Mattox has. I'm not sure how that's going to impact his ability to enter a voluntary and knowing plea to Counts 2 and 3."

The State further questioned whether Mattox could have the intent to commit robbery if, based on the mental defect defense, he did not have the intent to commit murder. Defense counsel emphasized that, by pleading no contest, Mattox merely declined to challenge the intent to commit robbery. A few days later, the court heard further arguments and concluded:

"I had pause last Friday to accept the no contest plea on the basis of the understanding from Defense that they're going to put on psychologists to opine as to Mr. Mattox's mental state at the time these events occurred. I listened to the psychologists. I am of the opinion—I had certain questions in my mind at that time exactly what we were getting into in raising this mental issue, disease or defect defense. Everybody's only of one mind. You may be competent in your mind for purposes of going to trial and perhaps for other issues concerning the defense here of mental disease or defect. There may be other issues arise. I'm going to [err] on the side of caution, Mr. Mattox. I'm going to deny your request to enter a no contest plea. I think the case authority gives the Court a discretion to do so. The valid reason is really the mental issues and mental health evidence that I anticipate hearing in this case."

In *Donesay*, we held that, absent a valid reason, a district court should accept a guilty plea when (1) the requirements of K.S.A. 22-3210 are satisfied and (2) the defendant admits the truth of the charge and every material fact alleged in it. 265 Kan. at

21

81-82; see K.S.A. 22-3209(1). Unlike *Donesay*, however, the no contest plea here did not require the defendant to admit the truth of the charge. While a guilty plea is an "admission of the truth of the charge and every material fact alleged therein," a no contest plea is a "formal declaration that the defendant does not contest the charge." K.S.A. 22-3209(1)-(2). Therefore, a district court should accept a no contest plea when (1) K.S.A. 22-3210's requirements are met and (2) the defendant does not contest the charge. See K.S.A. 22-3209(2). Yet, we emphasize that a defendant does not have an absolute right to plead to fewer than all counts listed in the complaint—to accept or reject such plea is well within the district court's discretion. 265 Kan. at 81-82.

K.S.A. 22-3210, which governs a district court's acceptance of a no contest plea, provides in relevant part:

"(a) Before or during trial a plea of guilty or nolo contendere may be accepted when:

"(1) The defendant or counsel for the defendant enters such plea in open court; and

"(2) in felony cases the court has informed the defendant of the consequences of the plea, including the specific sentencing guidelines level of any crime committed on or after July 1, 1993, and of the maximum penalty provided by law which may be imposed upon acceptance of such plea; and

"(3) in felony cases the court has addressed the defendant personally and determined that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea; and

"(4) the court is satisfied that there is a factual basis for the plea."

Though the district court did not quote K.S.A. 22-3210(a) verbatim, it was clearly concerned with the requirement in subsection (4) that there be a "factual basis" to the charges at issue, including the requisite mental states. If Mattox lacked the mental capacity to possess intent on Count I, premeditated murder, the district court was understandably skeptical that Mattox could factually possess the intent to commit the crimes in Counts II and III.

A reasonable reading of the transcript suggests that the judge realized there was no need for a formal plea colloquy since K.S.A. 22-3210(a)(4) had not been satisfied. The court was not required to recite the K.S.A. 22-3210 colloquy in its entirety when it reasonably concluded that one factor—a factual basis for the mental state elements of the charges—was missing. Since we find the district court reasonably concluded that Mattox's mental defect defense cast doubt on the sufficiency of the factual basis underlying the pleas, the district court did not abuse its discretion in rejecting the pleas and declining to recite the K.S.A. 22-3210 colloquy in its entirety.

At trial, Mattox sought to have his father testify that on the night of the murder, he received a text that said, "Dad, it's Joe. I need help bad." The text was sent from Hilt's phone to Steven Mattox's phone number. The State objected on hearsay grounds. Mattox argued the statement was not hearsay because it was not offered to prove the truth of the matter stated. Instead, Mattox offered it "for the state of mind which [was] [Mattox's] whole defense." The district court sustained the State's objection, finding the statement was hearsay because Mattox was not testifying and no exception applied.

Mattox's counsel then clarified that the statement was admissible under the excited utterance exception to hearsay. However, the court ruled that the excited utterance exception did not apply because the contemporaneous utterance requirement was unmet. It reasoned, "For the excited utterance to apply, it has to be a contemporaneous utterance.

23

In this case, we don't have any context of what was going on with Mr. Mattox at the time that this text message was sent." The court stated Mattox could introduce the operative fact that the text message was sent, but the contents were hearsay unless Mattox testified.

On appeal, Mattox argues the statement was admissible because it qualifies as two exceptions to hearsay: (1) excited utterance, K.S.A. 2015 Supp. 60-460(d)(2), and (2) statement of mental or physical condition of declarant, K.S.A. 2015 Supp. 60-460(l). We find the statement does not qualify as an excited utterance and the second argument is not preserved for review because Mattox failed to object on such ground at trial. See *Engelhardt*, 280 Kan. at 127 ("'[t]he defendant cannot object to the introduction of evidence on one ground at trial and then assert a different ground on appeal'") (quoting *State v. Synoracki*, 253 Kan. 59, Syl. ¶ 10, 853 P.2d 24 [1993]). Therefore, the text message was inadmissible hearsay. Finding no error, we affirm the district court's evidentiary ruling.

We review the admissibility of evidence under an exception to the hearsay rule for abuse of discretion. *State v. Seacat*, 303 Kan. 622, 634, 366 P.3d 208 (2016). "A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *Moore*, 302 Kan. at 692.

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible." K.S.A. 2015 Supp. 60-460. This rule is subject to a number of exceptions, including the firmly-rooted excited utterance exception, which "allows a hearsay statement to be introduced to prove the truth of the matter when the statement was made under the stress of nervous excitement caused by such perception." *State v. Bryant*, 272 Kan. 1204, 1209, 38 P.3d 661 (2002); see K.S.A. 2015 Supp. 60-460(d)(2).

In *State v. Rowe*, 252 Kan. 243, 843 P.2d 714 (1992), we outlined the requirements for admitting a statement under the excited utterance exception: "'1. An event or condition occurred. 2. It was startlingly sufficient to cause nervous excitement. 3. The declarant perceived it. 4. The declarant made the statement while under stress of nervous excitement.'" 252 Kan. at 250 (quoting Barbara, *Kansas Evidence Objections with Evidentiary Foundations* § 7.6, p. 7-18 [1988]). The *Rowe* court described an excited utterance as having "the characteristic of spontaneity arising either from the reaction to contemporary perception or from the excitement which carries over from the event." 252 Kan. at 248-49 (quoting 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(d), p. 239 [1979]). Whether a statement meets the spontaneity requirement is largely a matter for the district court's discretion. 252 Kan. at 249.

An excited utterance does not exist in a vacuum—to meet the *Rowe* factors, a party claiming the excited utterance exception applies must provide evidence of the context in which the statement was made. For example, in *State v. Brown*, 285 Kan. 261, 296, 173 P.3d 612 (2007), we held the excited utterance exception did not apply because of the precise problem here—a lack of evidence regarding the surrounding context. In *Brown*, the original declarant told a bystander about the shooting, and the bystander repeated the statement to the testifying witness. We found there was no way of knowing whether the original declarant personally observed the shooting or suffered nervous excitement when the statement was made because there was no contextual evidence in the record. 285 Kan. at 296. In contrast, in *State v. Hughes*, 286 Kan. 1010, 1019-20, 191 P.3d 268 (2008), we found the declarant was under the nervous stress and excitement of an ongoing aggravated robbery because the testifying witness described the chaos inside the house. The witness testified that the declarant was physically struggling with the victim, everyone was yelling and screaming, and the declarant was crying. 286 Kan. at 1019-20.

Here, the district court reasonably concluded that the lack of context was fatal. Mattox presented no witness to testify about the surrounding circumstances. Standing alone, the statement—"Dad, it's Joe. I need help bad."—is ambiguous. Indeed, it is entirely plausible that Mattox was seeking help from his father to dispose of the body. Based on the evidence in front of us, we cannot tell what event Mattox was perceiving and whether he made the statement spontaneously under stress. As the district court explained,

> "I don't have any context to know what the excited utterance was about. We don't know what was going on with Mr. Mattox at that time. That's the problem for me to make a determination that there was an excited utterance. The most classic case is where a car is careening off the road into a building or a tree or something and somebody screams something at that time. We have the context. Here we have nothing. That's all."

Looking to the utterance alone as evidence of the *Rowe* factors is a fruitless endeavor. The district court did not err.

*4. The district court properly denied Mattox's motion to suppress his confession.*

Prior to trial, Mattox moved to suppress his confession to police. He claimed that that (1) he invoked his right to counsel during the interrogation; (2) his *Miranda* waiver was not knowing, intelligent, and voluntary; and (3) his confession was not voluntary because it was induced by promises of leniency. Following a 2-day suppression hearing, the district court denied the motion. At trial, Mattox contemporaneously objected to the testimony related to the confession and the admission of the interrogation recording. The district court granted Mattox a continuing objection, preserving the issue for review. See K.S.A. 60-404; *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). As discussed at length below, we conclude that Mattox did not unequivocally invoke his right to counsel and both his *Miranda* waiver and subsequent confession were knowingly, intelligently, and voluntarily made.

26

In reviewing a trial court's decision regarding the suppression of a confession, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014). Substantial evidence refers to evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). This court does not reweigh the evidence, assess the credibility of the witnesses, or resolve evidentiary conflicts. *State v. Ransom*, 288 Kan. 697, 705, 207 P.3d 208 (2009).

### a. Mattox did not unambiguously invoke his right to counsel.

At the suppression hearing, the district court heard testimony from law enforcement and psychologists and reviewed Mattox's *Miranda* warning and waiver form, as well as the DVD of Mattox's interrogation. Based on this evidence, the court determined that Mattox did not invoke the right to counsel during the interrogation. On appeal, Mattox argues the evidence demonstrates he clearly invoked his right to counsel.

The rules governing an accused's constitutional right to counsel during a custodial interrogation are well established. "The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent." *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). The Kansas Constitution also provides that "[n]o person shall be a witness against himself [or herself]." Kan. Const. Bill of Rights, § 10. A suspect can invoke the *Miranda* right to counsel at any time. *Walker*, 276 Kan. at 944. Invocation of the right requires, at a minimum, some statement that can be reasonably construed as an expression of a desire for the assistance of an attorney during custodial interrogation. 276 Kan. at 944-45 (citing *McNeil v. Wisconsin*,

27

501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 [1991]). This rule has two components. First, the suspect "'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Walker*, 276 Kan. at 945 (quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 [1994]). This is an objective reasonableness test. *State v. Aguirre*, 301 Kan. 950, 957, 349 P.3d 1245 (2015), *cert. denied* 136 S. Ct. 895 (2016). "Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings." *Walker*, 276 Kan. at 945 (citing *McNeil*, 501 U.S. at 178).

Law enforcement must scrupulously honor a suspect's decision to invoke the *Miranda* rights and cut off further interrogation elicited by express questioning or its functional equivalent. See *Aguirre*, 301 Kan. at 956-57; *State v. Scott*, 286 Kan. 54, 69, 183 P.3d 801 (2008), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). However, "where a suspect makes a statement which may be ambiguous as to whether he or she is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify or may continue questioning without clarifying." *Scott*, 286 Kan. at 69-70; see *Walker*, 276 Kan. at 945 ("it is good practice for the interrogator to ask clarifying questions; however, it is not required and the questioning may continue").

The interview began at approximately 7:17 p.m. About 7:24 p.m., a detective read Mattox his *Miranda* rights, and Mattox signed the waiver form. The detective informed Mattox that initialing the waiver "[d]oesn't mean . . . you have to . . . you can stop anytime you want. It's purely voluntary. It doesn't obligate you to anything and if you would want to just sign right there, and I will just sign below it."

About 7:32 p.m., the detective asked what happened after the group went to QuickTrip. Mattox responded that "things went wrong and crazy." Mattox first said that

28

the plan was to drive around, go to QuikTrip, get cigarettes, and go back home. The detective asked, "Ok so how did we end up where we are today from that?" Mattox responded that he did not know. Then the following exchange took place:

"Detective Lance Jordan:  Where did the path separate from there? Was it at the QuikTrip?

"Mattox:  . . . You all care if I get a lawyer in here?

"Detective Jordan:  A what?

"Mattox:  A Lawyer present.

"Detective Jordan:  A Lawyer?

"Mattox:  Yeah.

"Detective Jordan:  Well I mean that's your right.

"Mattox:  [Inaudible on DVD]

"Detective Jordan:  Well . . . listen this is your one and only opportunity right now to tell us what you were thinking, to tell us if you are sorry about what happened, to tell us what your participation in this is, otherwise, we gotta look at everything else, what's going on, ok? So it's your choice, you need to decide whether you want something like that to happen, if you want an attorney in here, because that's something that you decide. And you don't get that second choice, once that choice is made, it's done. So, I am unclear on what I heard from you. Because we are done once that happens, ok. And I wanna make sure that's what you wanna do.

"Detective Keating:  No more input on your part. We have everybody else's input but we won't have yours.

29

"Mattox: Um . . . I'm just . . .

"Detective Jordan: So I just wanna be clear. I am not saying you can't have that. If that's what you want then we'll go that route but I want . . . I want to hear clearly from you what you want because it sounded kind of ambiguous to me. And that sounds like to me that you don't want to give us your input into the case, into what happened.

"Mattox: We were just riding around and shit, like . . .

"Detective Jordan: Well before we go any further I wanna make sure this issue is kinda settled. What . . . what do you want to do with this? You want to help us with this case?

"Mattox: [Nods.]

"Detective Jordan: Because that's what I'm hearing from you so far. It sounds like . . . it looks like your whole body language and everything it looks like you wanna help out with this and that you are sorry. Is that a fair statement or not?

"Mattox: Yeah.

"Detective Jordan: Ok is that something that you want to get resolved here tonight with us?

"Mattox: Yeah."

The detective asked again whether Mattox wanted to keep talking about what happened after QuickTrip, and Mattox resumed his story of events.

The district court found the question, "You all care if I get a lawyer in here?" was ambiguous. It reasoned:

30

"That could be interpreted [as] 'I want an attorney right now. I'm not going to talk to anybody until I get it.' Another interpretation is 'I'm thinking about it. Would you care if I brought one in?' That is something short of saying 'I want an attorney.' The Supreme Court has repeatedly said [invocation] of your right to Counsel must be clear and unequivocal."

Furthermore, the court determined the detective's follow-up questions were proper to clarify what Mattox wanted—to ask for an attorney and stop the interview or keep telling his story—and Mattox decided to tell his story. Thus, the district court concluded that Mattox did not unambiguously invoke his right to counsel.

Of note, certain portions of the interview contain inaudible mumblings by the defendant. The district court found that Mattox did clearly ask, "You all care if I get a lawyer in here?" but concluded, "I didn't see or hear any other reference to a request for Counsel in the interview." Nonetheless, Mattox argues on appeal that the portion of the interview designated above as "inaudible" is actually the question, "Well can I get one?" There is no evidence in the record to support this suggestion—which was not even asserted before the district court at the suppression hearing—and we therefore will not consider it. *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015) (party asserting error "has the burden of designating a record that affirmatively shows the error"). Furthermore, upon an independent review of the video, we hold substantial competent evidence supports the findings of the district court. There are no other disputed facts relevant to this issue.

What remains is a reprise of the arguments asserted below—that Mattox unambiguously invoked his right to counsel during the exchange that began with his question, "You all care if I get a lawyer in here?" Mattox attempts to analogize his case to *Aguirre*, where we found the defendant's statement of "'I'm going to take my rights'" was sufficient to invoke the right to counsel. 301 Kan. at 960-61. This comparison is unconvincing—Mattox's statement bears no resemblance to the invocation in *Aguirre*.

31

Mattox's initial statement was a question. At best, Mattox's case is more akin to *Davis v. United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L .Ed. 2d 362 (1994), where the United States Supreme Court held that a suspect's ambiguous statement, "'maybe I should talk to a lawyer,'" was insufficient to invoke his right to counsel.

A reasonable law enforcement officer under the circumstances would not have interpreted Mattox's statements as an unambiguous invocation of counsel. Mattox first asked, "You all care if I get a lawyer in here?" Next, a detective asked Mattox to clarify the question, and Mattox responded, "[a] lawyer present." But that response was not a separate request or demand. Instead, it was a response to the detective's follow up question. Ostensibly, Mattox was clarifying that his initial question meant: "Do you care if I have a lawyer present?" A reasonable officer would not have construed this question as an *unequivocal* request to have a lawyer present.

The question, "Do you care?" is a hallmark of equivocation. It thus left room for law enforcement to follow up and clarify whether he wanted to invoke his right to counsel and stop the interview or keep talking. Mattox kept talking. We take a moment to express concern that the manner in which detectives followed up on the question—by feigning concern for Mattox's only chance to tell his side of the story—came perilously close to interfering with Mattox's opportunity to clarify that he wanted a lawyer present. The better practice would be to simply ask open-ended clarifying questions such as, "Do you mean you want a lawyer?" However, under these facts, Mattox was afforded the opportunity to invoke, and he chose not to.

Therefore, we hold that the district court correctly concluded that Mattox did not unambiguously invoke his right to counsel.

*b. Mattox's* Miranda *waiver and confession was knowing and voluntary.*

Mattox next claims that his *Miranda* waiver was involuntary and the district court should have suppressed his confession. We hold that substantial competent evidence supports the district court's factual findings. Further, the district court was correct as a matter of law that the State met its burden to prove by a preponderance of the evidence that the *Miranda* waiver was given knowingly and voluntarily.

At the conclusion of the suppression hearing, the district court determined that at the time of the interview, the victim's body had not been located and so there "was a matter of urgency" in locating her body. It further found Mattox's psychologists, Dr. David George Hough and Dr. George Athey, testified that he "suffered certain cognitive deficiencies and was otherwise overly suggestive to the police interrogation such that he could not or did not possess the mental capacity to intelligently waive his *Miranda* rights."

Regarding Dr. Hough's testimony, the district court observed:

> "I have difficulty with . . . the failure of Dr. Hough to utilize some healthy skepticism about what he was being told.

> "In particular, the MMPI test was given. It showed that it was not valid because of the exaggerations that Mr. Mattox engaged in. The State's doctor showed the same exaggeration in this regard. It indicates possibility that Mr. Mattox was attempting to orchestrate a result or conclusion that would show that he had sufficient mental impairment. I have difficulty with that."

The district court also had reservations about Dr. Athey's testimony that Mattox was susceptible to being manipulated by police:

33

"The point that Dr. Athey presented in his testing; Mr. Mattox was overly suggestive, did not have the ability to say no or refuse the police, but he did.

"On two prior interviews with the police, he lied to them and stood up to them and denied that he had any knowledge about the disappearance of Keighley Alyea.

"Again, toward the end of the interview process, Detective Jordan where he repeatedly asked about any sexual assault with respect to Ms. Alyea, he stood his ground and said no.

"So he demonstrated the ability to say no when he wanted to or stand up to the police."

At one point, the district court remarked that the defense experts' "opinions when you test them for underlying data really don't measure up."

The State presented expert testimony from a psychologist, Dr. Mitchell Flesher, offering a competing opinion. In reaching his decision, Dr. Flesher reviewed the police reports, investigative reports, witness statements, psychological evaluations from Dr. Athey and Dr. Hough, and the DVD of the interrogation. He also conducted his own interview of Mattox and concluded that his "functioning was normal in most areas." In addition, Dr. Flesher casted doubt on Dr. Athey's conclusions.

The district court also made several findings regarding Mattox's personal characteristics. Although the court was told of abuse by Mattox's father, it found no evidence of abuse above ordinary discipline. It further did not believe Mattox's contention that he had a long and tortured history with drugs, given that he was only 21 years old. Mattox's own expert testified that his IQ level is 89, which could be average. Moreover, the district court noted that Mattox's statements to doctors about his drug use were inconsistent and contradictory.

34

In addition, detectives presented Mattox with the *Miranda* waiver form. The district court discussed the detectives' actions in obtaining Mattox's waiver:

"At the time the *Miranda* warning, Exhibit 2, was presented to the Defendant, the Defendant was in the interrogation room. Detective Jordan who was taking the lead in the interrogation room slid his chair up to Mr. Mattox on the table, presented the form to him. While Mr. Mattox was reading the form, he read it out loud along with him. He went through the five acknowledgements of rights. Mr. Mattox was told if he agreed, he could go ahead and place his initials there. He did.

"The next part of the form deals with the waiver of the rights and the willingness of Mr. Mattox to speak to the police. He agreed. Again, signed his initials, signed the form, and it was dated on 1725 hours on October 5."

A review of the interview transcript confirms the district court's description of the events.

During the hearing on the motion to suppress, Detective Jordan testified that the video fairly and accurately reflected the interview that took place. He observed no signs of impairment and believed that Mattox clearly understood the English language.

At the beginning of the interview, the detectives provided Mattox with a soft drink. Near the end of the interview, Jordan asked Mattox if he was hungry and wanted pizza and another soft drink. Mattox was given both. At one point during the interview, Mattox asked and was given an opportunity to use the restroom. Detective Jordan testified that Mattox did not appear to be confused or not understand his questions. Mattox responded in a clear and coherent manner, had no trouble following Detective Jordan's line of questioning, and Mattox did not answer any of the questions out of context. According to Detective Jordan, Mattox was actively engaged in the interview, and Detective Jordan had no concerns about his mental status. The detectives were aware that Mattox was 21 years old.

The district court ultimately found that Mattox did not lack the ability to voluntarily waive his *Miranda* rights.

This court judges whether a *Miranda* waiver was knowing, voluntary, and intelligent under a totality of the circumstances test. *State v. Mattox*, 280 Kan. 473, 482-83, 124 P.3d 6 (2005). The State bears the burden of proving by a preponderance of the evidence that the confession was voluntary—that the statement was the product of the defendant's free and independent will. 303 Kan. at 392. We have set out a list of nonexclusive factors for courts to consider when making such determinations: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the defendant's ability to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency in the English language. *State v. Gibson*, 299 Kan. 207, 214, 322 P.3d 389 (2014).

In *State v. Randolph*, 297 Kan. 320, 301 P.3d 300 (2013), we explained,

"These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." 297 Kan. 320, Syl. ¶ 3.

The essence of such an inquiry is to determine whether the accused's statement was the product of his or her free and independent will. *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 2, 106 P.3d 39 (2005). However, "[f]or a confession to be involuntary based on

coercive conduct of the State, there must be a link between the coercive conduct and the confession." 279 Kan. 18, Syl. ¶ 7.

Mattox presented two experts who testified that his waiver was involuntary due to mental issues at the time of the interview. Initially, Mattox presented testimony from Dr. Hough, a clinical psychologist. Dr. Hough reviewed all the background records, including the transcript and tape of the interrogation, and interviewed Mattox. Dr. Hough concluded that Mattox was unable to fully knowingly and voluntarily waive his *Miranda* rights.

Dr. Hough testified that one test suggested that Mattox's profile was "consistent with severe mental disturbance." He explained that the possible diagnosis would fall within a cluster of personality disorders that typically contain psychotic features. Dr. Hough said, "[A]t least as [Mattox] reported it. He's endorsed a number of items that would be consistent with psychotic levels of functioning." Another test indicated that several of Mattox's perceptions were at a "psychotic level of perception" and that they were "heavily infused with strong emotion." When asked whether Mattox had impaired capacity to think logically and coherently and perceive people and events realistically, Dr. Hough said yes.

Mattox also presented expert testimony from Dr. Athey, a clinical psychologist and neuropsychologist. After evaluating Mattox, Dr. Athey concluded that Mattox was unable to voluntarily waive his *Miranda* rights. In reaching this conclusion, Dr. Athey reviewed Dr. Hough's testing and performed several tests on Mattox, including the "Gudjonsson Suggestibility Scale, Second Edition" (GSS 2) test. According to Dr. Athey, the GSS 2 results suggested that Mattox was highly vulnerable under pressure during interviews. When asked about Mattox's interview, Dr. Athey observed:

37

"[Mattox was] told 'You can have an attorney,' and he's told 'This is your last time to talk to us.' Those two don't go together, but he thinks it does. That makes the threat of not being able to talk to them again and to tell the story I think override his verbal—his repeated second verbalization for an attorney."

Dr. Athey further testified that the detectives' statement that this was Mattox's "only chance" was coercive to the point where it would cause Mattox to involuntarily continue talking even though he wanted to have an attorney present.

Dr. Flesher, on the other hand, testified that Mattox knowingly and voluntarily waived his *Miranda* rights. He opined that—based on the most recent literature in the field—the GSS 2 was not an appropriate test to determine the voluntariness of a *Miranda* statement. Dr. Flesher further noted that Dr. Athey failed to report in his conclusions that the overall general impairment indexes from Dr. Athey's testing were all within the normal range. Dr. Flesher also commented that Dr. Athey "pointed out or emphasized the areas of apparent impairment, but I believe that he minimized the areas of normal functioning." Dr. Flesher concluded that Mattox's function was normal in most areas.

During his examination by Dr. Flesher, Mattox said that he did not feel like the officers were mean to him, and he only objected to one question. Otherwise, Mattox told Dr. Flesher, "[he] felt like the officers were fairly straightforward with him." According to Dr. Flesher, Mattox's chief complaint about the interview process was that "he did not understand that by signing the piece of paper that was given to him that . . . he wasn't aware he'd be signing away his rights." Dr. Flesher also asked Mattox if he was concerned about what Hilt and Calbeck might be telling the officers. Mattox replied that he "didn't really think about that" and his "mind went blank." This contradicted what Mattox told Dr. Hough. More specifically, Mattox told Dr. Hough that he was aware that his cousin, Hilt, was being interviewed in a separate location at the same time and was "pretty convinced" that his cousin would say something that would harm him.

38

In *State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006), the defendant sought to suppress his statements because he was strung out on drugs, confused, and suffering from sleep deprivation. This court upheld the trial court's denial of the motion to suppress, finding that the videotape corroborated the officer's statement that the defendant was able to understand the questions asked and respond appropriately. 282 Kan. at 104, 106. Finally, when discussing Gonzalez' mental state, this court also remarked, "Even if defendant was in a particularly fragile or suggestive mental state at the time of the interview, there is no indication that [police] took advantage of this to coerce a confession." 282 Kan. at 104; see *State v. Woods*, 301 Kan. 852, 867, 348 P.3d 583 (2015) (finding that substantial competent evidence supported the district court's finding that defendant's confession was voluntary where he easily understood the questions posed and answered appropriately even though he had been previously diagnosed with schizophrenia).

We hold that the district court's factual findings were supported by substantial competent evidence and this factor does not suggest Mattox was coerced into waiving his *Miranda* rights. Moreover, a large portion of the district court's decision in regards to this factor is based on the relative weight it assigned to the opinions of Dr. Hough, Dr. Athey, and Dr. Flesher. We will not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. See *State v. Ransom*, 288 Kan. 697, 705, 207 P.3d 208 (2009).

We see no issue with the duration of the interrogation. It lasted 3 hours, and Mattox began confessing less than half an hour after it began. We have previously stated that a 12-hour interrogation "stretch[ed] to the temporal boundaries of an uncoercive interrogation," but that the duration and manner of the interview were not coercive under the circumstances. *State v. Brown*, 285 Kan. 261, 274, 173 P.3d 612 (2007). This court has also held certain interrogations to be voluntary although they lasted similar or longer periods of time. See *State v. Walker*, 283 Kan. 587, 596-97, 603, 153 P.3d 1257 (2007) (finding that statements were voluntary where defendant was held for almost 13 hours

and confessed to committing crime after about 8 hours); *State v. William*, 248 Kan. 389, 409-11, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (concluding that statements were voluntary where defendant was interrogated for approximately 6 hours over a 19-hour period). In addition, Mattox concedes in his brief that detectives maintained a "calm demeanor" during the interrogation.

We hold that the district court's ruling was supported by substantial competent evidence, and this factor weighs against Mattox.

Other than his argument that he invoked his right to counsel, Mattox does not claim he was denied his ability to communicate with the outside world. Moreover, as the State points out, Mattox did not request to contact any individuals during the interview. Thus, this factor is unilluminating. See *State v. Betancourt*, 301 Kan. 282, 295, 342 P.3d 916 (2015), (explaining that "past cases have examined 'the accused's ability to communicate *on request* with the outside world'"); *Walker*, 283 Kan. at 598 ("While isolation from the outside world can be a factor in making an interrogation coercive, it is to be expected that police will take steps to limit the ability of potential witnesses and suspects to communicate and, potentially, conspire during an investigation.").

Mattox contends that his age, intellect, and background weigh against voluntariness because he was "young [and] had limited criminal history and no evidence of experience with custodial interrogation or Miranda protections." The record indicates, however, that he was 21 years old at the time of the interrogation and that he had contact with law enforcement on two prior occasions—one for possession of marijuana at age 17 and the other at 20 when he was arrested for theft. As such, he was well beyond the age of adulthood and was somewhat familiar with the legal process. See *Betancourt*, 301 Kan. at 293 (finding no evidence that defendant's mental condition, age, or intelligence interfered with his ability to understand his rights where he was 20 years old, had a previous arrest, and had obtained his GED).

The district court found that although Mattox was not "the brightest student in the class," he possessed the ability to understand what was said to him, he was oriented to time, place, and person, and he understood the purpose of the interview. Contrary to what Mattox's experts argued, the district court found that Mattox was concerned that Hilt and Calbeck were blaming him. The district court believed that "[Mattox] had motivation to continue on and get his side of things out."

According to the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)—which was conducted by Dr. Hough—Mattox fell in the "low average" intelligence range. The final score was composed of several other scores, such as his verbal comprehension in the 19th percentile for his age; his perceptual reasoning (making sense of things visually and mechanically) in the 55th percentile; his working memory in the 23rd percentile; and his processing speed in the 18th percentile. The full scale score and aggregate number placed him in the 23rd percentile.

According to other tests performed by Dr. Athey, Mattox's neuropsychological deficits, although in the mild range, placed him below 96 percent of his age and education peers—young adults with eighth-grade educations. Dr. Athey also found that Mattox displayed "persistent right hand problems in motor functioning and sensation," which Dr. Athey classified as an otherwise not specified cognitive disorder. Another test conducted by Dr. Athey indicated "the kind of thought disorder that would be on a bipolar spectrum." He further noted that Mattox "can't absorb verbal information fast at all." Ultimately, Dr. Athey concluded that Mattox was at a high risk "to make statements and comply with officers and make him vulnerable to give up his right to an attorney on the assumption that it's not a right when he's already asked for an attorney."

Dr. Flesher testified that Mattox's IQ of 89 would not prevent him from being able to voluntarily waive his *Miranda* rights and nothing about his reading comprehension

41

level would prevent him from waiving them either. Mattox also had no psychological conditions that would prevent him from voluntarily waiving his *Miranda* rights. Dr. Flesher concluded:

> "Given all the information that I had, the testing that was done by the other doctors and the testing that was done by myself, there did not seem to be any areas of psychological vulnerability that would impair his ability to make a knowing and voluntary waiver. There did not appear on the video to be any coercive factors that would have overridden basically a normal functioning individual's capacity to make that decision."

Mattox's own expert testified that his IQ level is 89, which could be average. Even if considered to be on the cusp of low intelligence, this, by itself, is insufficient to render his confession involuntary. *Randolph*, 297 Kan. at 330 ("[I]t is well established that low intelligence alone does not preclude a finding that an accused knowingly and voluntarily waived his or her *Miranda* rights."); see *Woods*, 301 Kan. at 868 (finding that defendant's mild intellectual disability, in and of itself, was insufficient to render his confession involuntary); *State v. Johnson*, 286 Kan. 824, 837, 190 P.3d 207 (2008) (stating that defendant's IQ of 80 did not preclude a finding that he knowingly and voluntarily waived his *Miranda* rights); *State v. Mays*, 277 Kan. 359, 374-76, 85 P.3d 1208 (2004) (explaining that a defendant's low intellect should never dispose of the issue of constitutional voluntariness); *State v. Lane*, 262 Kan. 373, 386, 940 P.2d 422 (1997) (stating that defendant's IQ of 77 was only one factor to consider).

Mattox must show he was coerced to confess. This is something he simply cannot show. In *Randolph*, this court allowed the waiver based on the trial court's findings that

> "'[a]ll indications from the defendant in the statement are that his mental condition was not abnormal.' The court also noted that Randolph's intellect was adequate as 'demonstrated by inference from the coherence of his statement and the responses to

questions that the detective' asked him. Further, the trial court found that Randolph's intellect was 'adequate . . . to appreciate things like voluntariness and coercion.'" 297 Kan. at 330.

The district court in this case made very similar findings, which are supported by substantial competent evidence. This factor, therefore, suggests that Mattox's waiver was the product of his free and independent will.

In regard to the interrogation, the district court found:

"It was held in an interrogation room at the Tomahawk Station. Mr. Mattox was seated. The officers were pulled back from him some distance. They were not in his face. The general questioning was pretty much 'Tell your story. What happened? Give us some details.' There was not a lot of direct questions put to him or leading questions put to him. It was more of his opportunity that was given so he could tell his own story.

. . . .

"As I watched the Defendant, especially as we got to where the body was located, he seemed quite eager and willing to help in trying to locate the body on the maps on the laptop computer. I think he genuinely wanted to be of assistance in this regard. I think the officers were much appreciative of his help in locating where the young lady's body was located at.

"I didn't see anything coercive in the interview process. I thought Detective Jordan and his colleague were most professional in the way they dealt with Mr. Mattox. There [were] no strong arms. There [were] no threats. There was no loud talking. No abuse of any kind. I think they gave him a fair opportunity to have his say and get his story. I think he wanted to do that."

Mattox argues that the "detectives implied cooperation was necessary to gain their assistance" and that he "was induced to make his statement based upon promises of

43

leniency repeatedly made by detectives to 'be in his corner' and 'go to bat for him.'" According to Mattox, the detectives repeatedly stated that they were trying to figure out what to do with "'the situation.'"

In *Brown*, we reiterated our standard on the issue of promises of leniency to an accused:

"[I]in order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believes to have the power or authority to execute it." *Brown*, 285 Kan. at 276).

As the State points out, Mattox does not explain what "help" he would receive in exchange for his cooperation. Moreover, under *Brown*, the detectives made no articulable promise of leniency in exchange for his confession. The detectives simply told Mattox that they wanted to know the truth about what happened. Moreover, in *State v. Johnson*, 253 Kan. 75, 853 P.2d 34 (1993), this court found that promises by police to speak with the District Attorney and tell him if the defendant was being cooperative was not considered coercive as long as the officers did not bargain for or promise anything to the defendant. 253 Kan. at 84; see also *State v. Ninci*, 262 Kan. 21, 39-40, 936 P.2d 1364 (1997) (finding that police officer's statement, "'[Y]ou can do some things to help yourself now,'" did not render confession involuntary).

Prior to Mirandizing him, officers told Mattox various things, such as:

"We are gonna have a little chat tonight and I hope we can get everything straightened the best that we can, Ok? Looking forward to working with you because we just need your help, all right? Alright?

. . . .

"We understand the facts, we just wanna know the reasoning behind it.

"And what that does is that allows people that maybe are sitting in your position over there across the table from us to sorta give their input into the situation. If we didn't care what you had to say you wouldn't be here talking to us right now. We would have found somewhere else to . . . you know . . . something else to do with you.

. . . .

"So that's why you are here tonight, is to, basically—we are allowing you to have that opportunity to talk to us and let us know some of those things. Does that sound pretty cool with you?"

Mattox concedes in his brief that detectives held a "calm demeanor" during the interrogation. Other than alleged promises of leniency, Mattox makes no other arguments suggesting coerciveness. And the few cases in which we have held a defendant's confession involuntary do not fit the facts of this case. In *Swanigan*, 279 Kan. at 32-39, we found a defendant's confession to be involuntary when law enforcement officers repeatedly used false information and evidence; law enforcement threated to convey defendant's lack of cooperation to the county attorney and to charge him with additional crimes unless he confessed; and there was evidence of the defendant's low intellect and susceptibility to anxiety. In that case, we expressly noted that any one of these factors—when considered in isolation—might not be sufficient to show coercion. Rather, the combination of all of these factors led us to find the statement was involuntary. 279 Kan. at 39.

In *State v. Stone*, 291 Kan. 13, 237 P.3d 1229 (2010), we found a confession involuntary when the defendant's apparent exhaustion was obvious during the

interrogation, which began at 1 a.m.; because of the defendant's garbled and disorganized responses to questions; because the detective made misleading and ultimately untrue statements indicating semen had been found on the victim's clothes; because the detective implied that if the defendant told the truth, which the detective repeatedly insisted was the version told by the victim, the length of any sentence could be affected; and because the detective said the defendant would be viewed as a sexual predator unless he confessed. See 291 Kan. at 15, 22-33. Notably, in both *Stone* and *Swanigan* this court "cautioned lower courts against extending their holdings beyond their particular facts." *State v. Swindler*, 296 Kan. 670, 680, 294 P.3d 308 (2013), *cert. denied* 134 S. Ct. 1000 (2014) (citing *Stone*, 291 Kan. at 32; *Swanigan*, 279 Kan. at 44).

Based on a review of the transcript, we hold that substantial competent evidence supports the district court's conclusion that the officers did not create a coercive environment. Moreover, we cannot discern any promise of some benefit made by the officers to Mattox. This factor does not support finding Mattox's *Miranda* waiver involuntary.

Lastly, we note that Mattox speaks English and has made no arguments to the final factor. None of the factors weigh in Mattox's favor, and we hold that he voluntarily waived his *Miranda* rights and made his confession. In sum, the district court's ruling is supported by substantial competent evidence, and under the totality of the circumstances, Mattox's confession was knowingly, intelligently, and voluntarily made.

*5. Mattox's statements to the State's expert psychologist were properly admitted.*

Mattox asserts that his right to counsel under the Sixth Amendment, Section 10 of the Kansas Constitution Bill of Rights, and K.S.A. 22-4503 was violated when Dr. Mitchell Flesher evaluated him on January 17, 2011, without his counsel present. We

46

hold that Mattox did not have a right—under any body of law—to have counsel present at this stage.

We note at the outset that the parties spend a great deal of effort arguing the extent to which the State stipulated it would not use information gathered during Dr. Flesher's initial evaluation. Mattox and the State also argue at length about defense counsel's alleged tactics in waiting until the day after the interview was completed to complain of the State's decision to have Dr. Flesher evaluate Mattox outside of his counsel's presence. We decline to speculate on the parties' motives and cut straight to the heart of the issue— whether the mental evaluation itself was a critical stage of the proceedings, thereby triggering Mattox's right to have counsel present.

During a hearing held on December 2, 2010, Mattox's counsel informed the court that the defense had retained two experts to conduct psychological evaluations of Mattox. Three weeks later, Mattox filed a notice of intent to rely upon mental disease or defect defense. At a status conference held on January 3, 2011, the State asked that the court grant its expert the opportunity to interview Mattox sometime in January due to Mattox's planned defense. The court "assume[d] that's implicit." Defense counsel responded, "Yes, Judge, we could do that. Just if he can notify me, because one of us would like to be present or at least overseeing it." Without addressing defense counsel's request to be present, the district judge told the prosecutor to "schedule through [defense counsel] and arrange for your folks to meet with Mr. Mattox as to that issue."

The following day, January 4, 2011, the State sent a letter to defense counsel informing her that Dr. Flesher did not want to have third parties present for fear of compromising the integrity of the process. The letter stated that unless defense counsel objected in the next few days, the State was going to have Dr. Flesher evaluate Mattox without anyone else present. Lastly, it stated that if defense counsel insisted on being present, they would need to schedule a hearing with the judge as soon as possible to

47

resolve the issue. The State never received a response from defense counsel, and on January 17, 2011, Dr. Flesher evaluated Mattox without counsel present. The day after the evaluation, defense counsel sent a letter to the State about scheduling a hearing on the issue because it wished to be present at the interview.

At the suppression hearing, defense counsel objected to Dr. Flesher's testimony on Fifth and Sixth Amendment grounds. In essence, defense counsel claimed that the State had violated the court's order by conducting the evaluation outside of defense counsel's presence. The court denied Mattox's motion to suppress, finding no "unfair prejudice" toward Mattox.

At trial, Dr. Flesher testified as a rebuttal witness for the State. Dr. Flesher's report—which was prepared for trial—referenced the initial evaluation on January 17, 2011. Before Dr. Flesher could take the stand, Mattox renewed his Fifth and Sixth Amendment objections to the interview. After Dr. Flesher took the stand and testified about his qualifications, defense counsel objected to and was granted a continuing objection regarding any testimony related to the first interview.

This issue comes before us in the context of a motion to suppress. Appellate courts use a bifurcated standard when reviewing a district court's decision on a motion to suppress. We review factual findings for substantial competent evidence and exercise unlimited review over the ultimate legal conclusions. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). In the present case, the parties do not dispute the material facts surrounding this issue. Thus, we exercise plenary review of the district court's order. See *State v. Fewell*, 286 Kan. 370, 376, 184 P.3d 903 (2008). Additionally, Mattox claims that his Sixth Amendment right to counsel was violated—a question that we review de novo. See *State v. Robinson*, 303 Kan. 11, 85, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016), *disapproved of on other grounds by State v. Cheever*, 304 Kan. 866, 375 P.3d 979 (2016).

The Sixth Amendment, made applicable to state proceedings by the Fourteenth Amendment to the United States Constitution, guarantees the right to the assistance of counsel. *State v. Brooks*, 297 Kan. 945, 949, 305 P.3d 634 (2013). The Sixth Amendment right to counsel applies "only to the 'critical stages' of the proceedings against the defendant." *State v. Pierce*, 246 Kan. 183, 191, 787 P.2d 1189 (1990) (quoting *United States v. Wade*, 388 U.S. 218, 224, 87 S .Ct. 1926, 18 L. Ed. 2d 1149 [1967]). "The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution." *Wade*, 388 U.S. at 227.

Also relevant to this analysis is the statute governing the procedure for asserting a mental disease or defect defense, which provides in pertinent part:

> "(2) A defendant who files a notice of intention to assert the defense that the defendant, as a result of mental disease or defect lacked the mental state required as an element of the offense charged thereby submits and consents to abide by such further orders as the court may make requiring the mental examination of the defendant and designating the place of examination and the physician or licensed psychologist by whom such examination shall be made." K.S.A. 22-3219(2).

Mattox argues that he was entitled to have counsel present during the mental evaluation. Initially, we note that the United States Supreme Court has not resolved this precise issue. In *Estelle v. Smith*, 451 U.S. 454, 469-71, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), the Court ruled that an indicted criminal defendant with appointed counsel could not be forced to submit to a pretrial psychiatric interview without *first* being permitted to consult with counsel. However, the Court did not touch on whether the defendant was entitled to counsel *during* a psychiatric evaluation. The Tennessee Supreme Court has also noted this limitation:

49

"Although the court said that the psychiatric interview 'proved to be a "critical stage" against' the defendant, its holding was limited to the question of whether the defendant was entitled to consult with counsel prior to the examination. The court did not find a Sixth Amendment right to have counsel at the examination and, in fact, noted with apparent approval the Court of Appeals' finding that 'an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination.' [Citation omitted.]" *State v. Martin*, 950 S.W.2d 20, 25 (Tenn. 1997).

We have previously held that when a defendant is asserting an insanity defense, a State's psychiatric examination of the defendant is not a critical stage during which defendant has a constitutional right to have counsel present. *State v. Brown*, 235 Kan. 688, 690, 681 P.2d 1071 (1984). In reaching this decision, we concurred with those jurisdictions that have stated that permitting counsel to be present would limit the effectiveness of the examination. 235 Kan. at 689-90. Our decision in *Brown* is dispositive of the issue here.

We also pause to note that several other state and federal courts have ruled that a defendant does not have the right to counsel during a psychiatric evaluation. See *United States v. Byers*, 740 F.2d 1104, 1120-21 (D.C. Cir. 1984); *United States v. Cohen*, 530 F.2d 43, 48 (5th Cir. 1976); *United States v. Baird*, 414 F.2d 700, 710-11 (2d Cir. 1969), *cert. denied* 396 U.S. 1005 (1970); *United States ex rel. Wax v. Pate*, 409 F.2d 498, 499 (7th Cir. 1969); *State v. Schackart*, 175 Ariz. 494, 501, 858 P.2d 639 (1993); *State v. Steiger*, 218 Conn. 349, 369-70, 590 A.2d 408 (1991); *Strickland v. State*, 247 Ga. 219, 220, 275 S.E.2d 29 (1981); *People v. Mahaffey*, 166 Ill. 2d 1, 19-20, 651 N.E.2d 1055 (1995), *cert. denied* 516 U.S. 1002 (1995); *Grandison v. State*, 305 Md. 685, 712-13, 506 A.2d 580 (1986); *State v. Hardy*, 283 S.C. 590, 592-93, 325 S.E.2d 320 (1985).

We therefore find that Mattox did not have a right to counsel during the mental evaluation performed by the State's expert witness.

*6. Cumulative Error*

Finally, Mattox argues that the totality of the errors he alleges deprived him of a fair trial. Having found no trial errors, this claim is without merit.

Mattox's convictions are affirmed. His sentence is vacated, and this matter is remanded to the district court for resentencing.

JOHNSON, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 111,162 vice Justice Johnson under the authority vested in the Supreme Court by K.S.A. 20-2616.